THOMAS CRIMMINS CONTRACTING CO., INC. and CAYUGA CONSTRUCTION CO., a Joint Venture, Respondent, v CITY OF NEW YORK et al., Appellants and Third-Party Plaintiffs, et al., Third-Party Defendant.

First Department, June 23, 1988

## APPEARANCES OF COUNSEL

*J. Robert Ellner* of counsel *(M. Carl Levine, Morgulas & Foreman,* attorneys), for respondent.

*Barry P. Schwartz* of counsel *(Fay Leoussis* and *John F. Grubin* with him on the brief; *Peter L. Zimroth, Corporation Counsel,* attorney), for appellants and third-party plaintiffs.

CARRO, J.

Plaintiff Thomas Crimmins Contracting Co., Inc., and Cayuga Construction Co., a joint venture (hereinafter plaintiff or contractor), entered into a contract with the City of New York, acting through its agent the New York City Transit Authority, to construct a section of the proposed Second Avenue subway. Among the provisions of this lengthy contract is article XXIV, which establishes a dispute resolution procedure and states as follows: "To prevent disputes and litigations, the Engineer shall in all cases determine the classification, amount, quality, acceptability and fitness of the several kinds of work and materials which are to be paid for under this contract, shall determine every question in relation to the Works and the construction thereof and shall determine every question which may be relevant to the fulfillment of this contract on the part of the Contractor. His determination and estimate shall be final and conclusive upon the Contractor, and in case any question touching this contract shall arise between the parties hereto such determination and estimate shall be a condition precedent to the right of the Contractor to receive any money under this contract." The contract defines the engineer as the chief engineer of the Transit Authority.

Included in the general clauses of the specifications to the contract is a clause dealing specifically with changed and unanticipated subsurface conditions at the construction site. This clause, section 201.34, provides that "(a) Should the Contractor encounter during the progress of the work, subsurface conditions at the site materially differing from any shown on the contract drawings or indicated in the specifications or such subsurface conditions as could not reasonably have been anticipated by the Contractor and were not anticipated by the City or the Authority, which conditions will materially affect the cost of the work to be done under the contract, the attention of the Engineer must be called immediately to such conditions before they are disturbed. The Engineer shall thereupon promptly investigate the conditions. If he finds that they do not so materially differ, or that they could not reasonably have been anticipated by the Contractor and were not anticipated by the City or the Authority, the contract may be modified with his written approval. However, the amount of an increase or decrease of cost resulting from such conditions shall be subject to prior written approval of the Comp-

troller's Chief Engineer. Any increase in costs resulting therefrom shall be subject to the Charter and Administrative Code provisions relating to additional work. (b) In addition to the foregoing, the prior written concurrence of the [Federal] Government and of the Commissioner of Transportation of the State and the State Comptroller shall be necessary."

Plaintiff did encounter what it believed to be changed and unanticipated subsurface conditions and brought these to the engineer's attention, who, except for a small adjustment with respect to the high rock claim, denied plaintiff's request for an upward adjustment in the contract price. Plaintiff also submitted to the engineer claims for protest work alleged to have been outside the scope of the contract and for payment of extra work which the engineer deemed necessary for completion of the contract. Most claims were denied.

Plaintiff thereafter commenced the within action seeking damages for the additional expenses incurred as a result of the unanticipated subsurface conditions and for the extra and disputed work claims previously denied. Defendant served an answer in October of 1980, an amended answer in November of 1980, and then five years later, sought leave to serve a second amended answer to set forth as a further defense that the engineer's determinations made pursuant to article XXIV, denying the very claims raised in the instant complaint, were final and conclusive and bar an action to have these claims litigated de novo. The motion was initially denied on the ground of prejudice to the plaintiff.

Upon renewal, the motion court, having conceded its factual error in finding prejudice to plaintiff due to delay, nevertheless denied the motion, finding the defense insufficient, as a matter of law, on the basis of *Naclerio Contr. Co. v City of New York* (69 NY2d 794, *affg on mem below* 116 AD2d 463). It is from this determination that the city appeals.

■ While the city's inordinate delay in asserting this defense lacks any justifiable excuse, plaintiff does not contend on appeal that this delay resulted in substantial prejudice. Thus, whether or not leave to amend should be granted turns solely on the question of the merits of the proposed defense. While prior law basically favored limited judicial review of proposed pleadings merely to establish facial sufficiency or to detect palpable defects, the favored practice has now become that when a substantial question is raised as to the meritoriousness of proposed pleadings, courts should resolve the question of

merit to obviate further time-consuming litigation. *(Brennan v City of New York,* 99 AD2d 445, 446; *Andersen v University of Rochester,* 91 AD2d 851, *appeal dismissed* 59 NY2d 968; *Sharapata v Town of Islip,* 82 AD2d 350, 362, *affd* 565 NY2d 332; *East Asiatic Co. v Corash,* 34 AD2d 432, 434.)

We begin our discussion of the merits with the observation that it has been a long-established practice, one which originated with government works' contracts, to provide in construction contracts that the completion, sufficiency, classification, and amount of the contractor's work be determined by a third person, usually the owner's architect or engineer, who typically issues the final certificate, certifying completion and adequacy of the work performed, and who the contract often authorizes to resolve work disputes. *(See generally,* 22 NY Jur 2d, Contracts, §§ 297-303.)

As early as 1859, the Court of Appeals, in reviewing a clause giving the defendant railroad's engineer broad authority to "decide every question * * * between the parties, relative to the execution [of the contract]," upheld the legitimacy of such "common" dispute resolution clauses and described their purpose as "to prevent disputes in regard to the amount and character of the work performed; and to secure the accuracy of all measurements and calculations, by having competent persons to make them." *(McMahon v New York & Erie R. R. Co.,* 20 NY 463, 465.) Given the limited effect of these clauses, they have not been deemed assailable because the engineer was employed by the governmental body for whom the construction is being performed, nor because the engineer's determinations are made final only as to the contractor. *(See, e.g., O'Brien v Mayor of City of N. Y.,* 139 NY 543, 576-577.)

Although some cases construing the scope and effect of such dispute resolution clauses have drawn parallels to arbitration clauses and have loosely termed the architect or engineer an arbitrator, determinations made pursuant to these clauses have not been subjected to the limited judicial review accorded to arbitrators' decisions pursuant to CPLR article 75, but instead have been reviewed pursuant to judicially created rules, as set forth in *Joseph Davis, Inc. v Merritt-Chapman & Scott Corp.* (27 AD2d 114). "The extent of the right of a third party, such as the Authority's engineers, to bind the parties by their determination is well settled. If a contract provides that the decision or determination of an engineer shall be final and binding, such finality attaches, in the absence of

fraud, bad faith or palpable mistake equivalent to bad faith, only to those determinations involving quantity or quality of material, classification or amount of work performed, or a calculation as to a final estimate; where the expertise of the engineer is important and essential *(Sweet v. Morrison,* 116 N. Y. 19; *Yonkers Contr. Co.* v. *New York State Thruway Auth.,* 26 A D 2d 766; *Dowd* v. *State of New York,* 239 App. Div. 141, 142). *In short, the resolution of factual disputes is the prerogative of the engineers. Absent any question of construction of the contract, the engineers' determination could not be challenged. They do not, however, have the power to construe the contract* (see, generally, Ann. 137 A. L. R. 530; 10 N. Y. Jur., Contracts, §§ 155-156). The cases cited above are distinguishable from those situations where the meaning of the terms is to be construed and where the court's responsibility for construction cannot be assumed by the engineers so as to oust the court of jurisdiction *(Daniels Co.* v. *City of New York,* 196 App. Div. 856; *Merrill-Ruckgaber Co.* v. *City of New York,* 160 App. Div. 513; *Uvalde Contr. Co.* v. *City of New York,* 160 App. Div. 284; *Burke* v. *Mayor,* 7 App. Div. 128). The legal meaning of the contract is always the responsibility of the court and not of the engineers" *(supra,* at 117-118 [emphasis added]).

Even *Savin Bros. v State of New York* (62 AD2d 511, *affd on opn below* 47 NY2d 934), upon which the dissent partially relies to support its argument that the instant dispute resolution clause conclusively determined plaintiff's claims and bars the within action, also reiterated the now well-established rule that while "the parties are free to leave certain determinations to the judgment of the engineer and, where this has been done, the determination of the engineer is final as a matter of law, absent a showing of fraud or bad faith * * * the contractor is not bound by the engineer's erroneous construction of law in interpreting the contract *(Smith Contr. Co. v City of New York,* [240 NY 491], *supra; Daniels Co. v City of New York,* [196 App Div 856], *supra; Burke v Mayor, etc. of City of N. Y.,* 7 App Div 128)" *(supra,* at 516).

This exclusion which preserves for the judicial forum issues involving questions of law can hardly be said to undermine the specific purposes underlying these clauses and, indeed, is responsive to a problematic factor in having an engineer or architect make legal determinations. As one commentator has observed: "The whole purpose behind courts allowing contracts to make architect's decisions final at all is to allow

experts to protect the owner who lacks expertise in the field. Architects having no particular legal expertise, the courts should be willing to review their legal conclusions made on points not concerned with the quality or nature of the work required * * * Compare this with the case of an arbitrator, whose expertise, if not strictly legal, is certainly in the area of settlement of disputes. It should go without saying that when the reason for the rule ceases, the rule also ceases, and experts are therefore not entitled to conclusive deference outside the areas of their expertise" (Corbin, Contracts § 652, at 790-791 [Kaufman 1984 Supp]).

The City of New York cannot ignore the effect of these cases by arguing that they are nevertheless inapplicable to the instant broadly worded clause, for this very same clause has itself been interpreted in this manner since at least 1893. The contract at issue in *O'Brien v Mayor of City of N. Y.* (139 NY 543, *supra)* included the very same article XXIV clause *(supra,* at 575). While the city never asserted that the plaintiff contractor was barred by the clause from bringing its action to recover on its previously denied excavation claim, the court did note that the dispute therein involved a question of contract construction, which the court then went on to review on the merits *(supra,* at 568).

Subsequently, in *Daniels Co. v City of New York* (196 App Div 856, *supra)* this court specifically ruled that despite the article XXIV language that the engineer is to "determine every question which may arise relative to the fulfillment of this contract on the part of the Contractor", the engineer's determinations were only final and conclusive on such issues as "quality of material * * * and * * * quantity and classification of material," but not as to points of law and contract construction *(supra,* at 862, 864). Likewise, in *Smith Contr. Co. v City of New York* (209 App Div 271, *mod* 240 NY 491, *supra)* this Court again confirmed that article XXIV does not bar an action de novo on matters involving contract construction *(supra,* at 277, 279). While this court, however, reversed the jury's verdict as to one item involving the classification of certain work, concluding that that issue was within the engineer's domain *(supra,* at 279), the Court of Appeals reinstated the verdict on that point, relying on two equally viable theories: that the engineer's classification of the work was so arbitrary as to be the equivalent of bad faith, or that the engineer misconstrued the contract terms. *(Smith Contr. Co. v City of New York, supra,* 240 NY, at 499, 500.) Under either

theory, the court ruled, article XXIV did not bar de novo litigation of the contractor's claim *(supra,* at 500).

Since these decisions interpreting article XXIV predate *Ardsley Constr. Co. v Port Auth.* (54 NY2d 876) and *Maross Constr. v Central N. Y. Regional Transp. Auth.* (66 NY2d 341) upon which the city and the dissent so heavily rely, it is important to determine whether these more recent decisions explicitly or implicitly overrule this long judicial history of construction of these clauses. The court's opinion in *Ardsley* indicates that the parties there had agreed to be bound by the standard of review of *Tufano Contr. Corp. v Port of N. Y. Auth.* (18 AD2d 1001, *affd* 13 NY2d 848): that the decision of the engineer was conclusive, unless infected by fraud, bad faith or palpable error. *(Ardsley Constr. Co. v Port Auth., supra,* 54 NY2d, at 877.) Thus, although the Court of Appeals noted that the *Ardsley* dispute resolution clause was different from the *Tufano* clause and more akin to an arbitration clause in that it did not exclude the engineer from determining questions of law, it did not disturb the parties' agreement to be bound by the *Tufano* standard of review. *Tufano,* in turn, did not involve a dispute pertaining to contract construction, and thus the standard of review applied therein, that the engineer's determinations were final unless infected by fraud, bad faith or palpable error, is consistent with the case law limiting finality to the engineer's factual determinations.

*Maross (supra),* however, squarely presented the court with what it concluded was "a broad arbitration clause", which empowered the architect, who was privately retained by the Transportation Authority and not one of its employees, "to decide all questions of any nature whatsoever arising out of, under or in connection with, or in any way related to or on account of, this Contract (including claims in the nature of breach of Contract or fraud or misrepresentation * * *)" and made those decisions "conclusive, final and binding on the parties" and not subject to impairment or waiver by negotiations or settlement offers *(supra,* 66 NY2d, at 344).

Having concluded that this was a broad arbitration clause, and noting that no public policy challenge was made to its scope, the court held that the clause did empower the architect to interpret the contract and limited judicial review of his decisions to that review available under the decisional law relative to arbitration.

*Maross (supra),* however, does not stand for the proposition

that all construction contract dispute resolution clauses should be treated as broad, binding arbitration clauses and certainly did not explicitly or even implicitly overrule the long history of judicial construction of the very clause involved herein. Furthermore, the differences between the subject dispute resolution clause and the *Maross* clause, the differences between a municipal agency and a public corporation engaging in construction projects and certain public policy concerns compel us to conclude that the *Maross* standard of review should not be applied across the board to any dispute resolution clause and certainly not to the one at issue here.*

The *Maross* arbitration clause specifically provided that the decisions of the privately retained architect were mutually binding "on the parties", as is typical in arbitration. This indicated that the contract contemplated the submission of disputes by both parties. Article XXIV, on the other hand, exists so that the contractor will submit its disputes to the engineer and specifically binds only the contractor. The reality is that neither the city nor the Transit Authority need formally submit their disputes to the engineer for resolution, since the engineer is their agent and employee, represents their interests and, furthermore, is the one who protects the city's interests as he directs, inspects and supervises the work and assigns any required additional work under the contract. The subservient position of the chief engineer vis-à-vis city officials was noted in *O'Brien v Mayor of City of N. Y.* (139 NY 543, *supra)* where the court observed that because the chief engineer was obligated to follow the directions and interpretations of the city's Commissioner of Public Works and had no power to discharge his duties under article XXIV by invoking and applying equitable considerations, the engineer therefore "occupied no such position as an ordinary arbitrator upon a disputed question submitted by the parties for decision" *(supra,* at 585).

*Maross* and also *Ardsley (supra),* on the other hand, involved public corporations. The juridical independence of public corporations from the political limitations imposed on

---

* Contrary to the dissent's suggestion that these issues are not properly before us, they were clearly addressed below, prompting defendants-appellants to argue on appeal against these points, and plaintiff-respondent's brief incorporates the arguments raised below and before this court in the recent cases: *Grow Tunneling Corp. v City of New York* (123 AD2d 899, *affd* 70 NY2d 665) and *Naclerio Contr. Co. v City of New York* (116 AD2d 463, *affd on mem below* 69 NY2d 794).

the State and its political subdivisions has been long noted. *(See, Grace & Co. v State Univ. Constr. Fund,* 44 NY2d 84, 88; *Matter of New York Post Corp. v Moses,* 10 NY2d 199, 203-204; *Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn. v New York State Thruway Auth.,* 5 NY2d 420, 423.) Although the Transit Authority is also a public corporation, it openly acted as the agent of the City of New York with reference to this contract and is therefore bound by the same limitations as restrict the city. *(See, Grace & Co. v State Univ. Constr. Fund, supra,* 44 NY2d, at 88.)

Another such limitation is that, as opposed to the arbitrator in *Maross (supra,* at 344), whose decisions could not be "impaired or waived by any negotiations or settlement offers in connection with the question decided," the chief engineer, pursuant to the City Charter, has no authority to settle or adjust a claim, since that power is expressly reserved to the City Comptroller. (NY City Charter § 93 [g]; *see, Bush v O'Brien,* 164 NY 205, 212.) To suggest, then, that the engineer herein has any judicial autonomy to settle questions of law and contract construction is not only to defy the realities of his position of subservience within the city's political structure, but contravenes as well the City Charter provisions pursuant to which this contract must comply.

■ Given these inherent limitations, then, in law and reality, of the engineer exercising any true impartial juridical autonomy, it is beyond question that it would violate public policy to interpret article XXIV as making the engineer the final arbitrator over questions of contract construction, for to do so would be to make the city the final and conclusive arbitrator over its own disputes. *(Naclerio Contr. Co. v City of New York,* 116 AD2d 463, 464, *affd on mem below* 69 NY2d 794, *supra.)* The situation here presents not a matter of having a person serve as arbitrator who has some known relation to a party, but, rather, the inherent inequity of having as an arbitrator one who is one of the parties. *(Compare, Matter of Cross & Brown Co. [Nelson],* 4 AD2d 501, *with Matter of Siegel [Lewis],* 40 NY2d 687.) Thus, not only does the *Maross* decision *(supra)* not require that we depart from the established decisional law regarding these dispute resolution clauses, but public policy forbids that we do so.

The fact that the court in *Grow Tunneling Corp. v City of New York* (70 NY2d 665, *supra),* despite the city's request that it do so, failed to address this very same public policy argument, cannot, as the dissent argues, be interpreted to mean

that the Court of Appeals has rejected the argument. Principles of law are established by what is decided by a court, not by what the court fails to reach. Moreover, the Court of Appeals adopted the reasoning of our memorandum decision in *Naclerio (supra)* which specifically relied on this public policy argument. *(Naclerio Contr. Co. v City of New York, supra,* 116 AD2d, at 464, *affd on mem below* 69 NY2d 794.)

Having concluded that article XXIV does not bar a contractor from commencing an action to challenge the engineer's determinations on questions of law and issues of contract construction, we must now address the nature of plaintiff's claims. We address first the claims made pursuant to section 201.34 of the specifications, the changed conditions provision. Changed conditions clauses first appeared in Federal construction contracts just prior to World War II to ameliorate the problems which beset contractors in bidding on projects involving subsurface conditions. Prior to the adoption of these clauses, contractors either conducted their own borings of subsurface conditions, a time-consuming and expensive practice which raised the price of bids, or they simply added a high contingency factor to their bids to protect against unusual conditions discovered during the performance of the contract. *(See, Foster Constr. C. A. v United States,* 435 F2d 873, 887.)

Since introduction of these clauses, the government often makes its own core borings of subsurface conditions and makes logs of the borings, which are then included in the contract. The contractor relies on the logs, contract plans, drawings and specifications in preparing its bid and is then further protected by the changed conditions clause, which provides that should the conditions encountered materially differ from those shown in the plans, drawings, specifications or logs and affect the cost of performance of the contract, an equitable adjustment of the price will be made. *(Supra; see also, Kaiser Indus. Corp. v United States,* 340 F2d 322, 329.) The public benefits from these clauses in that the contractors "will have no windfalls and no disasters. The Government benefits from more accurate bidding, without inflation for risks which may not eventuate. It pays for difficult subsurface work only when it is encountered and was not indicated in the logs." *(Foster Constr. C. A. v United States, supra,* 435 F2d, at 887.)

It has been uniformly agreed that a determination as to whether changed conditions exist is a matter of contract

interpretation—whether the conditions encountered were reasonably indicated in the contract provisions, drawings or specifications—and, thus, a question of law for courts to resolve. *(Foster Constr. C. A. v United States, supra,* 435 F2d, at 880-881, 886-887; *Kaiser Indus. Corp. v United States, supra,* 340 F2d, at 333-334; *Johnson Constr. Co. v Missouri Pac. R. R. Co.,* 426 F Supp 639, 648; *Groves & Sons & Co. v State,* 50 NC App 1, 273 SE2d 465, 494, 496; *Metropolitan Sewerage Commn. v R. W. Constr.,* 72 Wis 2d 365, 241 NW2d 371, 377; *Catapano Co. v City of New York,* 116 Misc 2d 163, 166.)

Since such disputes involve questions of contract construction, they fall outside the scope of article XXIV, whether the changed circumstances clause is deemed subject to mandatory or equitable adjustments.

In fact, because of the strong public policy favoring such clauses, other courts have also rejected arguments that they have been stripped of their authority to review these claims because the claims were previously denied pursuant to contractual review procedures. *(See, e.g., Fattore Co. v Metropolitan Sewerage Commn.,* 454 F2d 537, 543; *Foster Constr. C. A. v United States, supra,* 435 F2d, at 880, 886, 888; *James Julian Inc. v President of Town of Elkton,* 341 F2d 205, 209; *Kaiser Indus. Corp. v United States, supra,* 340 F2d, at 329-330.) Accordingly, article XXIV is no bar to plaintiff's litigation of its changed conditions claims.

Neither is there any merit to defendant's argument that article XXIV precludes plaintiff from litigating its claims to recover for extra work and protest work. Extra work is defined as that work necessarily required in the performance of the contract, but which arises from circumstances which could not be anticipated. *(Savin Bros. v State of New York, supra,* 62 AD2d, at 516.) As the primary guide in determining whether or not certain work is extra work and whether the contractor is entitled to be paid for extra work is the contract itself, clearly this presents questions of contract construction *(supra,* at 515).

The issue of extra work is further complicated in this case by the fact that section 6-110 of the Administrative Code of the City of New York limits a city agency when ordering additional work to not exceed an expense over 10% of the contract price. Given this limitation, the city and chief engineer will inevitably be pressured to interpret broadly the contract work requirements, while narrowly construing their

definition of extra work, and to classify the work which contractors claim is extra work as contract work for which the contractor may not receive additional compensation. This further supports the public policy concern raised above of the inequities in the city's position that the engineer's conclusions on extra work are binding even if they involve erroneous constructions of the contract.

The same analysis applies with regard to the protest work claims. Protest work generally refers to that work which the contractor is ordered to perform, but which he argues lies completely outside that which was even intended by the contract. This is not a claim for extra compensation, as is the case with extra work, but rather is a claim for damages for breach of contract, and, as such, it involves questions of law, contract construction, and application of the judicially established limitations for seeking recovery on these claims. *(See generally, Borough Constr. Co. v City of New York,* 200 NY 149.)* Interestingly, the *Borough Constr.* contract also contained the article XXIV dispute resolution clause, which was no bar to the court's review of the merits of the contractor's protest work claims.

Should the plaintiff fail to sustain its claims that the engineer erroneously construed the contract and should the city satisfy the court that particular determinations only involved factual matters typically within the engineer's expertise, the plaintiff, then, will be bound by those determinations, absent proof they were infected by fraud, bad faith or palpable error. However, by no means may the city's position prevail that plaintiff is barred by article XXIV from commencing this action and arguing that the engineer erroneously construed the contract. To give to the engineer, who is obligated to answer to the city, the power to conclusively bind the contractor on legal determinations and, in effect, expose the contractor to the risks of performing, without compensation, work outside the intent of the contract or improper extra work would, as we recently said in a related context, be tantamount to "confer[ing] upon the municipality the unilateral power to modify the agreement and to impose on the contractor risks which he did not assume as part of his bargain." *(Kalisch-Jarcho, Inc. v City of New York,* 135 AD2d 262, 265.)

If we were to condone the city's proposed manner of resolving construction disputes, then the contractors, who would otherwise have no effective means of redress, would simply revert back to the old practice of adding high contingency

factors to their bids to cover the unacceptable risks of doing business with the city. *(See, Foster Constr. C. A. v United States, supra,* 435 F2d, at 887.) Public policy cannot tolerate such a result. Therefore, the motion to amend the pleadings to add as a defense that article XXIV bars litigation of plaintiff's claims is denied.

Accordingly, the order of the Supreme Court, New York County (Arthur Blyn, J.), entered August 4, 1986, which denied defendant's motion for leave to amend its answer to add an affirmative defense, should be affirmed, without costs.

SULLIVAN, J. P. (dissenting). This is an action on a construction contract to recover, *inter alia,* damages for changed subsurface conditions, as well as extra and protest (disputed) work. Defendants, the City of New York and the Transit Authority, appeal from the denial of their motion for leave to amend the answer to assert the affirmative defense that, pursuant to an alternative dispute resolution (ADR) procedure to which the parties had agreed, plaintiff submitted its claims for extra costs to the Transit Authority's chief engineer, whose determinations denying those claims are final and binding. Since, unlike the contractual provision at issue in *Naclerio Contr. Co. v City of New York* (116 AD2d 463, *affd on mem below* 69 NY2d 794), relied upon by the motion court, which was found not to be an ADR clause, the applicable provision here clearly is, explicitly stating that its purpose is to "prevent disputes and litigations", and that the chief engineer's determinations are "final and conclusive", I would grant the motion for leave to amend.

In 1973, plaintiff, a joint venture, entered into a $33,000,000 contract with defendants for the construction of a portion of the proposed Second Avenue subway. Article 24 of the contract provided: "To prevent disputes and litigations, the [Chief] Engineer shall in all cases determine the classification, amount, quality, acceptability and fitness of the several kinds of work and materials which are to be paid for under this contract, shall determine every question in relation to the Words and the construction thereof and shall determine every question which may be relative to the fulfillment of this contract on the part of the Contractor. His determination and estimate shall be final and conclusive upon the Contractor, and in case any question touching this contract shall arise between the parties hereto such determination and estimate shall be a condition precedent to the right of the Contractor to receive any money under this Contract."

In conjunction with this provision, the parties agreed in section 201.34 of the contract to an even more specific ADR procedure with regard to claims concerning changed and unanticipated subsurface conditions at the construction site: "Changed conditions. (a) Should the Contractor encounter during the progress of the work, subsurface conditions at the site materially differing from any shown on the contract drawings or indicated in the specifications or such subsurface conditions as could not reasonably have been anticipated by the Contractor and were not anticipated by the City or the Authority, which conditions will materially affect the cost of the work to be done under the contract, the attention of the Engineer must be called immediately to such conditions before they are disturbed. The Engineer shall thereupon promptly investigate the conditions. If he finds that they do so materially differ, or that they could not reasonably have been anticipated by the Contractor and were not anticipated by the City or the Authority, the contract may be modified with his written approval. However, the amount of an increase or decrease of cost resulting from such conditions shall be subject to the prior written approval of the Comptroller's Chief Engineer. Any increase in costs resulting therefrom shall be subject to the Charter and Administrative Code provisions relating to additional work."

Pursuant to the foregoing ADR procedure, plaintiff, in 1974, filed with the then chief engineer, Colonel John T. O'Neill, a claim of changed subsurface conditions with respect to the flow of underground water, which was affecting its dewatering operation; soil subsidence; and the location and configuration of rock formations which were hampering excavation. In that same year plaintiff also submitted claims for protest work, which it believed was outside the scope of the contract, as well as other claims for the payment of extra work which the parties agreed the contractor would perform. At least two of the protest work claims were filed with O'Neill. One sought additional payment for the lowering of existing house sewers, which were obstructing construction. The other concerned the substitution of a particular type of pipe in lieu of the one prescribed by the contract. Subsequent to O'Neill's death in 1978, plaintiff filed an extra work claim with respect to the protection of open trenches with George Ziegler, his successor as chief engineer.

In the course of considering the changed conditions claim, O'Neill visited the construction site on at least two occasions,

and met several times with plaintiff's representatives, as well as those of De Leuw, Cather & Company (DCC), the Transit Authority's design and construction consultant on the project. O'Neill also consulted the Transit Authority's field engineers, as well as three of its then deputy chief engineers, who assembled voluminous reports and correspondence; attended and informed him of meetings and correspondence which they had with DCC and plaintiff's representatives; and prepared recommendations with respect to the claim.

In addition, O'Neill received documents submitted by plaintiff, as well as reports prepared by, among others, an independent geotechnical consulting firm, McClelland Engineers, Inc.; DCC; the Construction Division of the Transit Authority administering the contract; and Leonard Horn, a Transit Authority engineer not involved in the project.

The reports submitted by McClelland Engineers, the Construction Division and Horn all recommended denial of plaintiff's changed conditions claim in its entirety. The two reports prepared by the deputy chief engineers concurred in that view, except that they recommended a monetary allowance for additional drilling costs due to unanticipated high rock at a particular location at the construction site. They also disagreed with DCC's recommendation, which, contrary to its previous position, favored an additional payment to plaintiff with respect to the soil subsidence claim. DCC subsequently agreed with the deputy chief engineers that plaintiff should receive an allowance with respect to the high rock claim. Eventually, plaintiff received $15,000 on that claim.

Based on the foregoing, O'Neill, by letter dated July 21, 1977, denied plaintiff's changed conditions claim except to indicate that the Transit Authority was in the process of further evaluating the high rock claim. He also accorded plaintiff an opportunity to present further evidence to substantiate the other aspects of its changed conditions claim, but it failed to do so. Although not contractually required, O'Neill, at plaintiff's request, issued a November 14, 1977 letter setting forth in detail the basis of his determination.

Plaintiff's extra and protest work claims were also thoroughly reviewed by the chief engineer. After completing his review, O'Neill, in two letters dated September 1, 1977 and March 6, 1978, denied the two protest work claims relating to the lowering of house sewers and the substitution of pipe. He determined that relocating house sewers was contract work

governed by the unit price provision, and, while noting that the contract permitted the substitution of other pipe, found that plaintiff's subcontractor had already purchased a quantity of piping that "would have been sufficient".

In an August 20, 1979 letter, Ziegler, to whom that particular claim had been submitted, denied plaintiff's extra work claim concerning the protection of open trenches, concluding that payment had already been made "under the terms of the contract and no other payment [could] be made." Forty-five other claims submitted by plaintiff to the chief engineer for resolution under the contract's ADR procedure were accepted.

In 1979, plaintiff commenced this action to recover, *inter alia,* damages for the same purported unforeseen subsurface costs and extra and protest work claims which the chief engineer had disallowed. Almost 5½ years later, after joinder of issue and the commencement of a third-party action against DCC, but before the case was placed on the Trial Calendar and while it was still in the discovery stage, defendants moved for leave to amend their answer to assert as an affirmative defense the finality of the chief engineer's determinations by reason of the ADR procedure set forth in article 24 and section 201.34 of the contract.

In opposing the motion, plaintiff, in part, contested the merits of defendants' proposed affirmative defense by asserting, *inter alia,* that the chief engineer's power under article 24 is limited to matters involving "measurement, quantification and interpretation" of the contract which arise during the course of the project; that other provisions in the contract indicate that the parties agreed to the judicial resolution of disputes; that the ADR procedure is void for want of mutuality in that defendants are purportedly not bound by the chief engineer's determinations; and that, in any event, O'Neill's determinations could not be final and binding because he had merely "rubber-stamped" the decisions, which were really those of his "remote subordinates". Plaintiff also claimed that, in view of defendants' purported gross laches, it would be prejudiced if leave to amend were granted, since it could no longer depose O'Neill, who had died, to determine if he had "actually played any part" in the denial of its claims.

The court denied the motion, based upon defendants' unexplained laches in seeking to interpose their proposed ADR affirmative defense. Believing that O'Neill had died during the period that defendants allegedly had delayed in making their

motion, the court concluded that if the amendment were granted plaintiff would be "severely hampered" in its attempt to ascertain whether O'Neill's ADR determinations were, in fact, made by "lower level" Transit Authority personnel, as plaintiff claimed, rather than by O'Neill. The court also noted that, in any event, "various questions exist[ed] as to the sufficiency of the proposed amendment" in light of this court's affirmance, without opinion, in *Grow Tunneling Corp. v City of New York* (111 AD2d 602). The court opined that a similar motion for leave to amend by the city had been denied in *Grow* "under facts and circumstances which were, if anything, more favorable to the City."

Defendants thereafter sought renewal on the grounds that the court had been misled to believe that O'Neill had died after the service of their original answer, when, in fact, his demise had occurred over a year prior to the commencement of the action, and that subsequent to its denial of the motion the Court of Appeals, in *Maross Constr. v Central N. Y. Regional Transp. Auth.* (66 NY2d 341), had upheld as binding an ADR determination rendered pursuant to a clause similar to article 24 of the contract. The court granted renewal on the basis of having been misinformed as to the timing of O'Neill's death, and, upon renewal, again denied the motion for leave to amend. Citing this court's dictum in *Naclerio Contr. Co. v City of New York (supra,* 116 AD2d, at 464) that "it is contrary to both general principles of law and public policy to allow a party to a contract" to act as an ADR decision maker, it concluded that the proposed affirmative defense, insofar as it was predicated upon article 24 of the contract, was "insufficient as a matter of law." This appeal is from that determination.

Courts have repeatedly enforced CPLR 3025 (b)'s prescription that leave to amend pleadings should be "freely given". *(See, e.g., Edenwald Contr. Co. v City of New York,* 60 NY2d 957, 959; *McCaskey, Davies & Assocs. v New York City Health & Hosps. Corp.,* 59 NY2d 755, 757; *Tankers Intl. Nav. Corp. v National Shipping & Trading Corp.,* 116 AD2d 40, 48.) Such relief should not be denied on the basis of the proposed amendment's lack of merit unless the subject pleading is "palpably invalid". *(Holland Am. Cruises v Carver Fed. Sav. & Loan Assn.,* 60 AD2d 545; *accord, Shepherd v New York City Tr. Auth.,* 129 AD2d 574.) Thus, the moving party need only make some showing of merit with respect to the proposed pleading. *(See, e.g., Kaye 1969 Assocs. v Lese,* 72 AD2d 728,

729; *Oak Point Indus. Park v Massachusetts Bay Ins. Co.,* 65 AD2d 552, 553.) That test has been met here.

Inexplicably, the majority, in order to justify denying defendants' motion to amend the answer, has chosen to create public policy issues which even plaintiff did not advance on appeal. The argument that the ADR clause at issue endows the engineer with the authority to resolve questions of law is not only without jurisprudential support, but is, in any event, irrelevant, since a designated arbitrator clearly may determine even questions of law, if the parties pointedly intend to permit such a result.

The Court of Appeals has held, as a general principle of law, that final and binding ADR determinations may be made regarding questions of law, including those requiring the interpretation of a contract. *(See, Stanley & Son v Trustees of Hackley School,* 42 NY2d 436; *De Lillo Constr. Co. v Lizza & Sons,* 7 NY2d 102, 105-106.) While, concededly, a municipality was not a party in either of these cases, the majority is unable to advance an acceptable rationale as to why a municipality should be excluded from entering into a contract containing such a clause. Indeed, if anything, the courts should be more disposed to uphold such clauses where a municipality is involved, because of the potential for saving taxpayer moneys, a consideration which the majority has apparently ignored in its evaluation.

Nor does an exception to the foregoing rule exist, as the majority holds, with respect to changed conditions claims such as the one at issue. In so holding, the majority erroneously equates the standard changed conditions clause used in Federal Government and other noncity contracts with section 201.34 of the contract. Unlike section 201.34, the Federal changed conditions clause provides that an adjustment in the contract is mandatory if the contractor's changed conditions claim is substantiated. The Federal clause is predicated on the concept that the government will remove the risk of unknown conditions from the contractor and obtain lower bid prices, but suffer the uncertainty of not knowing at the outset the ultimate cost of the project. *(See, e.g., Kaiser Indus. Corp. v United States,* 340 F2d 322, 329.) By contrast, section 201.34 was drafted with a quite different philosophy, i.e., that the risk of unknown subsurface conditions be placed on the contractor, and taken into account in the bid. Defendants, in turn, were assured that the price bid would be the ultimate cost, except

in those instances where the chief engineer, in his discretion, awarded a contract adjustment.

The majority also argues that public policy precludes enforcement of the clause at issue on the basis of some amorphous and, more importantly, irrelevant distinctions between a municipality and a public corporation engaging in construction contracts. Historically, any differences that may exist between a public corporation and a municipality turn on the particular convenience for which the corporation was created, usually to facilitate a public purpose without certain constitutional or legal impediments which might otherwise apply. *(See, Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn. v New York State Thruway Auth.,* 5 NY2d 420, 423; *also, Grace & Co. v State Univ. Constr. Fund,* 44 NY2d 84, 88-89; *Matter of New York Post Corp. v Moses,* 10 NY2d 199, 203.) Oftentimes, a municipality might be restricted from entering into certain ventures, or have a debt ceiling which would render impossible its direct involvement in the management of the venture. Yet, such distinctions hardly provide a rationale for precluding municipalities from entering into contracts and bargaining for certain advantages available to others, such as an ADR clause.

In voting to allow the amendment sought, I am not unmindful of the Court of Appeals recent decisions in *Naclerio Contr. Co. v City of New York* (69 NY2d 794, *supra)* and *Lovisa Constr. Co. v City of New York* (69 NY2d 801). In affirming both cases on the opinion of this court in *Naclerio* (116 AD2d 463, *supra),* the court, in effect, held that the clauses in issue, which were identical to each other, did not constitute an arbitration or alternative dispute resolution clause. Nor do I overlook the Court of Appeals subsequent decision in *Grow Tunneling Corp. v City of New York* (70 NY2d 665, *supra)* affirming the denial of the city's motion for leave to amend its answer to add as an affirmative defense the finality of a determination rendered pursuant to the same clause as in *Naclerio.*

*Naclerio, Lovisa* and *Grow (supra)* are distinguishable since the Court of Appeals in those cases was not asked to pass upon the finality of ADR determinations rendered pursuant to contractual provisions which were in any way similar to article 24 and section 201.34. Those decisions turned on the peculiar language of the *Naclerio* clause, which provided, in relevant part, that one of the city's Commissioners was empowered "[t]o review and determine any and all questions in

relation to this contract and its performance" *(supra,* 116 AD2d, at 464). In interpreting this clause the Court of Appeals adopted this court's holding in *Naclerio (supra,* 116 AD2d, at 464), that there was no clear evidence that the parties intended to enter into a final and binding ADR process. Unlike the *Naclerio* clause, article 24 of the contract states that it is intended to "prevent disputes and litigations", and that the decision maker's determinations are "final and conclusive". In my view, such language more than adequately demonstrates the requisite intent, lacking in *Naclerio, Lovisa* and *Grow,* to employ and be bound by an ADR procedure.

In recent decisions the Court of Appeals has repeatedly held that where such an intent is sufficiently expressed, ADR determinations are final, even in the absence of express provision therefor, as long as they are not the result of fraud, bad faith, or palpable error, or, as the court noted in *Maross Constr. v Central N. Y. Regional Transp. Auth. (supra,* 66 NY2d, at 346), not completely irrational or in violation of a strong public policy. *(See, e.g., Ardsley Constr. Co. v Port Auth.,* 54 NY2d 876; *Savin Bros. v State of New York,* 47 NY2d 934, *affg on opn below* 62 AD2d 511; *Tufano Contr. Corp. v Port of N. Y. Auth.,* 13 NY2d 488.)[1]

Indeed, the Court of Appeals decision in *Grow* (70 NY2d 665, *supra)* demonstrates the continuing vitality of the foregoing legal principle. In *Grow,* the city specifically asked the court to articulate whether it had intended in *Naclerio* and *Lovisa (supra)* to overrule its previous decisions in *Ardsley* and *Maross (supra)* and thereby hold unenforceable all ADR contractual provisions which designate an employee or agent of a contracting party as the decision maker. By narrowly limiting its affirmance in *Grow* to a holding that the *Naclerio* clause is not an arbitration or alternate dispute resolution provision making the decisions of the appropriate Commissioner final and binding, the Court of Appeals implicitly reaffirmed *Ardsley, Maross* and its earlier decisions. Thus, the rule remains intact that, where sophisticated contracting parties sufficiently evince an intent to follow an ADR procedure, determinations

---

1. The reported decisions in *Savin Bros. v State of New York* (47 NY2d 934, *affg on opn below* 62 AD2d 511) do not indicate the exact language of the ADR clause in the contract at issue. The State's brief filed with the Court of Appeals reveals, however, that, as in the case of the ADR provision in *Ardsley Constr. Co. v Port Auth.* (54 NY2d 876), the clause did not contain specific language regarding finality, conclusiveness, or binding effect.

rendered pursuant to that process will be upheld as binding, subject to the limited judicial review as noted herein.

In *Maross* (66 NY2d 341, 344, *supra)*, the Court of Appeals held to be conclusive a determination rendered by the "[Transportation] Authority's architect" pursuant to an ADR provision strikingly similar to the one employed here, the stated purpose of which was "[t]o resolve all disputes and to prevent litigation". It authorized the architect to "decide all questions of any nature whatsoever arising out of, under or in connection with, or in any way related to or on account of, this [c]ontract", and further provided that "his decisions shall be conclusive, final and binding on the parties" *(supra,* at 344).

The contractor in *Maross (supra)* had submitted its protest work claim, which was denied. Instead of complying with the architect's directive to perform the subject work, the contractor commenced an action seeking a declaration that it was not so obligated. The Court of Appeals held that the claim fell within what it described as an "all-encompassing" arbitral clause *(supra,* 66 NY2d, at 346), and that since the contractor failed to demonstrate that the ADR decision was "totally irrational or violative of a strong public policy" *(supra,* at 346) the architect's decision was binding.[2]

Contrary to the motion court's assertion that the ADR clause in *Maross (supra)* is not "remotely similar" to article 24, they are, in material respects, identical. Like the ADR provision in *Maross,* article 24 similarly provides that it is intended "[t]o prevent disputes and litigations"; that the chief engineer is to "determine every question which may be relative to the fulfillment of this contract on the part of the Contractor"; and that the chief engineer's determinations are "final and conclusive".

In addition to its broad all-inclusive language, article 24, more strongly than the ADR clause in *Maross (supra)*, also states that, in accord with its explicitly stated purpose of avoiding litigation, the chief engineer is specifically empowered to resolve conclusively questions concerning "the classification, amount, quality, acceptability and fitness of the several kinds of work and materials which are to be paid for under this contract * * * [and] every question in relation to the Words and the construction thereof".

---

2. Although the court defined the ADR provision in *Maross Constr. v Central N. Y. Regional Transp. Auth.* as a "broad arbitration" clause (66 NY2d 341, 342, 347), the parties had agreed, in fact, not to follow the formal procedures set forth in CPLR article 75.

Moreover, article 24, when read together with section 201.34 of the contract, provides specifically for an ADR procedure to resolve in "final and conclusive" fashion claims based upon changed and unanticipated subsurface conditions. Section 201.34 expressly requires the contractor "immediately" to bring such conditions to the chief engineer's "attention", and if, after investigation, the chief engineer finds that the conditions are materially different from the contract drawings and specifications and could not have been reasonably anticipated by the contractor and were not anticipated by the city or the Transit Authority, the contract "may" be modified with the chief engineer's approval.

Plaintiff's changed conditions claim is, therefore, precisely the kind of issue which the combined ADR procedure set forth in article 24 and section 201.34 was designed to address. Moreover, since plaintiff's protest work claims involve questions concerning the "amount" of the contract work and the "construction" of the contract, they fall within the specifically enumerated issues set forth in article 24. At the very least, the changed conditions and protest work claims, as well as the extra work claims, fall within the residual clause of article 24 empowering the chief engineer to "determine every question which may be relative to the fulfillment of this contract on the part of the Contractor." As this record demonstrates, plaintiff's conduct clearly reflects its understanding that article 24 and section 201.34 did, in fact, control. It submitted all of the foregoing claims to the chief engineer, who rendered determinations on each claim.

Significantly, the Court of Appeals has upheld ADR determinations as binding under circumstances where the parties' intent to employ a conclusive ADR process was not nearly as unambiguously expressed as here and in *Maross* (66 NY2d 341, *supra*). In *Ardsley* (54 NY2d 876, 877, *supra*), for example, the parties agreed to the following ADR procedure: "The Engineer shall determine the amount, quality, acceptability and fitness of all parts of the materials and Work, shall interpret the Contract Drawings, Specifications, and any Extra Orders, and shall decide all other questions in connection with the Contract." The contract did not state that the ADR procedure was intended to avoid litigation and that the ADR decision maker's determinations were to be final and binding or conclusive. Throughout the proceedings the contractors argued that the engineer lacked the power to decide their claims, and that, in any event, the engineer's decisions were

not final since the ADR provision did not specifically provide that his determinations would have that effect.

In affirming the dismissal of the complaint, the Court of Appeals held that the claims fell within the "broad scope" of the contract's all-encompassing ADR clause, which it characterized as a "disputes provision" *(supra,* 54 NY2d, at 876, 878), and that, therefore, the engineer's decisions were "conclusive and final as a matter of law" because the contractors did not demonstrate that the ADR decisions were "infected by fraud, bad faith or palpable error". *(Supra,* at 877.) Thus, the court rejected the contention that the engineer's determinations were not binding because of the absence in the ADR provisions of such words as "final", "binding" or "conclusive".

In denying defendants leave to amend their answer to assert as an affirmative defense the finality of the chief engineer's determinations, the motion court, in effect, nullified article 24 and section 201.34. Where the terms of a contract are clear and unambiguous, effect must be given to the intent of the parties, as manifested by the language they employed. *(Slatt v Slatt,* 64 NY2d 966, 967; *Matter of Western Union Tel. Co. [American Communications Assn.],* 299 NY 177, 184; *Mandel v 201 W. 16 Assocs.,* 121 AD2d 910, 911.) To hold otherwise is contrary to the well-established principle that courts cannot adopt an interpretation which renders a contract provision meaningless. *(Two Guys From Harrison-N. Y. v S.F.R. Realty Assocs.,* 63 NY2d 396, 403; *Audino v Lincoln First Bank,* 105 AD2d 1091, 1093, *affd* 65 NY2d 631.)

To the extent that the contract at issue provides for the judicial resolution of disputes by speaking of "claims * * * against the City"; an "action for breach of contract"; "compensation for any damage"; and an "action * * * against the City", it must be read, in view of *Maross* and *Ardsley (supra),* as referring to actions seeking nullification of the chief engineer's determinations under the ADR procedure on the grounds that the determinations are infected by fraud, bad faith, or palpable error, or are totally irrational or in violation of a strong public policy. These clauses are part of what are essentially "notice" provisions intended to apprise the city as to whether the contractor seeks to assert such a claim.

Analogous and, in some cases, more explicit references to litigation were also included in the contracts in *Maross* and *Ardsley (supra),* as their records on appeal disclose. Unlike this contract, section 2.01 (B) of the *Maross* agreement, for

example, referred to the contractor's legal "action" with respect to questions which had been submitted to the ADR decision maker. Section 9 of the *Ardsley* agreement did not merely provide, as does article 42 of this contract, that the contractor's acceptance of final payment constituted a release of "all claims". It stated as well that the release encompassed claims "whether or not in litigation". In addition, section 32 of the *Ardsley* contract, which pertained to the rights and remedies of the contractor, referred, as does article 42 here, to the contractor's claims for "money damages for any breach of this Contract". In upholding the ADR determinations in *Maross* and *Ardsley,* the Court of Appeals necessarily held that the other provisions in the contracts referring to litigation did not undercut the validity and finality of the ADR provision.

Nor does section 93 (g) of the New York City Charter interdict the invocation of the contract's ADR procedure, as the majority holds. The ADR procedure is entirely consistent with the power accorded the Comptroller in section 93 (g) to "settle and adjust" claims. In view of *Ardsley* and *Maross (supra),* defendants' liability has been limited to whether the chief engineer's ADR determinations under article 24, or in conjunction with section 201.34, are the result of fraud, bad faith, or palpable error, or are totally irrational or in violation of a strong public policy. Applying that standard, as he must, the Comptroller is fully empowered to review and settle such claims.[3]

The consistency between the contract's ADR procedure and the Comptroller's power to "settle and adjust" claims is further demonstrated by the fact that the term "claims", as used in section 93 (g), refers to claims which could otherwise be asserted in a lawsuit if not settled by the Comptroller. *(See,* Administrative Code of City of NY § 7-201.) Since article 24 and section 201.34 of the contract provide that the disputes at issue here must first be submitted to the chief engineer, they are not, at this stage, "claims" within the intent and meaning of section 93 (g) of the City Charter and section 7-201 of the Administrative Code. Should plaintiff bring an action challenging an adverse determination by the chief engineer on the grounds above noted, it would then be asserting a "claim" as that term is used in those statutes.

---

**3.** Section 93 (g) of the New York City Charter explicitly provides that the chief engineer's power to "settle and adjust" claims must be exercised in a manner which is consistent with applicable law.

In reaching its determination, the motion court also relied on this court's dictum in *Naclerio* (116 AD2d 463, *supra)* that the city's Commissioner, presumably in view of his relationship to the city, could not act as an ADR decision maker because it would be "contrary to both general principles of law and public policy" *(supra,* at 464). As already noted, by limiting its holding in *Grow* (70 NY2d 665, *supra)* to the inefficacy of the particular clause in issue as an ADR provision, the Court of Appeals indicated that it was not relying on that aspect of the decision. Indeed, in *Ardsley, Maross (supra)* and other cases, the Court of Appeals has consistently refused to find any infirmity in the designation of a government employee or agent of a contracting party as the ADR decision maker. In holding the determinations of the Port Authority's engineer in *Ardsley* to be binding, the Court of Appeals necessarily rejected the contractors' contention, as reflected in their brief, that the ADR procedure was void because the engineer improperly had sat "in judgment of a charge of misrepresentation which is essentially against him."

The Court of Appeals similarly upheld the ADR determination by the architect in *Maross (supra)* even though the architect was at least equally, if not more, intimately involved in the project at issue there as the chief engineer was here. As the record on appeal demonstrates, the architect there had designed and directed the construction of the project, and was, as noted by the contractor, "retained and paid by the [governmental] owner to specifically look out for the owner's interest."

Moreover, by analogy, even in the case of formal CPLR article 75 arbitration agreements, the Court of Appeals has held that a "fully known relationship" between an arbitrator and a contracting party, "including one as close as employer and employee" does not invalidate the agreement. *(Matter of Siegel [Lewis],* 40 NY2d 687, 690; *see, Olsen & Chapman Constr. Co. v Village of Cazenovia,* 33 AD2d 929, 930.) In fact, in *Corbetta Constr. Co. v Michigan Mut. Liab. Co.* (20 AD2d 375, 379, *affd* 15 NY2d 888), this court ruled that it is "perfectly legal and proper" for a governmental agency of one of the contracting parties to act as an arbitrator.[4] Thus, the

---

4. This court's sole reliance in *Naclerio Contr. Co. v City of New York* (116 AD2d 463, *affd on opn below* 69 NY2d 794) on its prior decision in *Matter of Cross & Brown Co. [Nelson]* (4 AD2d 501) as support for its conclusion that a government employee of a contracting party cannot act as

known relationship between the Transit Authority and the chief engineer does not invalidate the latter's determinations.

As for plaintiff's lack of mutuality claim, the contract's ADR procedure is enforceable irrespective of whether defendants are bound by the chief engineer's determinations. Even if they are not, and defendants do not so concede, it is well settled that parties to a dispute resolution clause may provide that they will not be equally bound by the decision maker's determination. *(Matter of Todd Shipyards Corp. [Marine Vessel Leasing Corp.],* 67 AD2d 646, *affd* 49 NY2d 809; *see, Matter of American Ins. Co. [Messinger—Aetna Cas. & Sur. Co.],* 43 NY2d 184, 194.) Sound policy considerations would justify such disparity in the case of a municipality. As was noted in *O'Brien v Mayor of City of N. Y.* (139 NY 543, 576-577), "There is no spur like self-interest in business enterprises, and it may be regarded as certain that the contractor will always take care of his own interests so far as it is possible * * * But how far the officers or employees who represent the general public or the corporation which is building the work can be depended upon for steady, earnest, zealous and able attention to the public interests is always a matter, to say the least, of some doubt. Hence the provisions for the binding force of the engineer's decision upon the contractors and an omission of any such provision in relation to the other parties to the contract."

It should be noted that ADR clauses such as the one involved here serve a salutary purpose. The advantage to the municipality in avoiding litigation and time-consuming delays in public projects is obvious. On the other hand, they afford contractors the opportunity to present their claims to government employees who have the necessary experience, training, and educational background to resolve what are frequently complex and technical matters, and to have prompt decisions rendered thereon. *(See generally, Matter of Goldfinger v Lisker,* 68 NY2d 225, 230-231; *Matter of Perl [General Fire & Cas. Co.],* 34 AD2d 748.) Such clauses also serve to avoid what

---

an ADR decision maker is open to question. In that case, the board of directors of a corporation had been designated as the arbitrator, not of construction contract disputes, but, rather, of labor disputes between the corporation and its employees. Moreover, while this court held that the arbitration agreement was invalid because the board was, "in fact", the corporation, it reaffirmed the principle that parties can knowingly designate as an arbitrator an individual who has some relationship to a party. *(Supra, at 503.)*

has been characterized as "vexatious and expensive and, to the contractor oftentimes, ruinous litigation." *(Kihlberg v United States,* 97 US 398, 401; *see, S & E Contrs. v United States,* 406 US 1, 8.) Indeed, the Court of Appeals has upheld provisions in other city construction contracts intended to avoid vexatious litigation, particularly where, as here, they are executed at arm's length. *(See, Kalisch-Jarcho, Inc. v City of New York,* 58 NY2d 377, 384.)

Finally, the argument that the determinations in question were unenforceable because they were actually made by O'-Neill's "remote subordinates" is a factual question which is irrelevant to whether the parties intended to employ a binding ADR procedure, the only question concerning the merits of defendants' proposed affirmative defense properly before the court. In any event, this record indicates that O'Neill actively participated in the determination of the claims submitted to him.

Accordingly, the order appealed from should be modified to the extent of granting defendants' motion for leave to amend the answer.

Milonas and Ellerin, JJ., concur with Carro, J.; Sullivan, J. P., and Rosenberger, J., dissent in an opinion by Sullivan, J. P.

Order, Supreme Court, New York County, entered on or about August 4, 1986, affirmed, without costs and without disbursements.