AMF INCORPORATED, Plaintiff,

v.

BRUNSWICK
CORPORATION, Defendant.

No. CV–85–2743.

United States District Court,
E.D. New York.

Nov. 4, 1985.

---

Bergson, Borkland, Margolis & Adler, Washington, D.C. by Hugh Latimer, Bruce M. Bettigole, for plaintiff.

Blodnick, Schultz & Abramowitz, P.C., Lake Success, N.Y. by Frederick Newman, for defendant.

## MEMORANDUM and ORDER

WEINSTEIN, Chief Judge.

In this case of first impression, AMF Incorporated seeks to compel Brunswick Corporation to comply with their agreement to obtain a non-binding advisory opinion in a dispute over the propriety of advertising claims. For reasons indicated below, the agreement to utilize an alternative dispute resolution mechanism must be enforced.

## I. FACTS

AMF and Brunswick compete nationally in the manufacture of electronic and automatic machinery used for bowling centers. In earlier litigation before this court, AMF alleged that Brunswick had advertised certain automatic scoring devices in a false and deceptive manner. Brunswick responded with counterclaims regarding advertisements for AMF's pinspotter, bowling pins and automatic scorer. In 1983 the parties ended the litigation with a settlement agreement filed with the court. Any future dispute involving an advertised claim of "data based comparative superiority" of any bowling product would be submitted to an advisory third party, the National Advertising Division ("NAD") of the Council of Better Business Bureaus, to determine whether there was experimental support for the claim.

Paragraph 9 of the agreement reads as follows:

> If either party shall hereafter publish or disseminate any claim by advertisement or promotional materials of any kind or nature, which expressly or impliedly refer to a comparative superiority of a bowling product manufactured, sold or distributed by either of them, as compared to a similar product manufactured,

sold or distributed by the other, which claim shall expressly or impliedly be based on data, studies or tests (hereafter "data based comparative superiority") such claims shall be subject to the provisions of this paragraph....

Should either party make a claim to data based comparative superiority, the other may request that substantiation for the same be delivered to the agreed upon advisory third party, subject to the provisions of this agreement, whereupon the party who has made the claim shall promptly comply.

Both parties agree to submit any controversy which they may have with respect to data based comparative superiority of any of their products over that of the other to such advisory third party for the rendition of an advisory opinion. Such opinion shall not be binding upon the parties, but shall be advisory only....

NAD was created in 1971 by the American Advertising Federation, American Association of Advertising Agencies, Association of National Advertisers, and the Council of Better Business Bureaus "to help sustain high standards of truth and accuracy in national advertising." It monitors television, radio, and print advertising, and responds to complaints from individual consumers, consumer groups, local Better Business Bureaus, competitors, professional and trade associations, and state and federal agencies. If NAD finds that the advertising claims are unsupported, and the advertiser refuses to modify or discontinue the advertising, the organization will complain to the appropriate governmental authority. *See* Statement of Organization and Procedures of the National Advertising Review Board, at ¶ 2.1A. Voluntary compliance with NAD's decisions has been universal. Reportedly no advertiser who has participated in the complete process of a NAD investigation and NARB appeal has declined to abide by the decision.

In March and April 1985, Brunswick advertised its product, Armor Plate 3000, in a trade periodical called *Bowler's Journal.*

Armor Plate is a synthetic laminated material used to make bowling lanes. It competes with the wood lanes produced by AMF. "The wood lane. A relic of the past," claims the advertisement, under a sketch of a horse and buggy. It goes on to detail the advantages of Armor Plate; and, as indicated in the footnote to the advertisement, strongly suggests that research supports the claim of durability as compared to wood lanes.

By replacing your worn out wood lanes with Armor Plate 3000, Brunswick's high tech laminated surface, what you're doing is saving money. Up to $500.00 per lane per year in lost revenue and upkeep.

That's because today's high technology has helped make Armor Plate 3000 so tough and good looking that it seems to last forever.*

* Continuing independent research projects that Armor Plate 3000 will now last over twenty years before the possible need arises to replace a small lane area much like replacing a broken board in a wood lane.

AMF, disputing the content of the advertisement, sought from Brunswick the underlying research data referred to in the footnote. Brunswick replied that having undertaken the expense of research it would not make the results available to AMF. Thereupon AMF informed Brunswick that it was invoking Paragraph 9 of the settlement agreement and requested that Brunswick provide substantiation to an independent third party. Brunswick responded that its advertisement did not fall within the terms of the agreement. AMF now brings this action to compel Brunswick to submit its data to the NAD for nonbinding arbitration.

## II. THE AGREEMENT COVERS THE DISPUTE

■ The agreement on its face covers the dispute. It provides, in relevant part, that:

If either party shall [1] *hereafter* publish or disseminate any claim by advertisement or promotional materials of any kind or nature, which [2] expressly or *impliedly refers to a comparative supe-*

*riority* of a bowling product manufactured, sold or distributed by either of them, as compared to a similar product manufactured, sold or distributed by the other, [3] which claim shall expressly or *impliedly* be *based on data, studies or tests* (hereafter "data based comparative superiority") [4] such *claims shall be subject to the provisions of this* paragraph....

(Emphasis supplied.) The advertisement (1), was published after the agreement of June 30, 1983. It (2), impliedly refers to comparative superiority of a Brunswick bowling product over one of AMF. It is (3), impliedly based on data and tests. Thus (4), the dispute is subject to the agreement.

The agreement also provides for a method of substantiation of the claim without resort to litigation. It reads:

> Should either party make a claim to data based comparative superiority, the other may request that substantiation for the same be delivered to the agreed upon advisory third party, subject to the provisions of this agreement, whereupon the party who has made the claim shall promptly comply.

> Both parties agree to submit any controversy which they may have with respect to data based comparative superiority of any of their products over that of the other to such advisory third party for the rendition of an advisory opinion. Such opinion shall not be binding upon the parties, but shall be advisory only....

The agreement specifies NAD as the appropriate third party. It states:

> The parties agree that the National Advertising Division of the Council of Better Business is agreeable to each as the advisory third party. Should NAD not agree to undertake any such advisory opinion, the parties undertake to mutually agree upon other procedures for the review of advertising claims.

NAD has agreed to undertake to examine the data and render an opinion.

## III.  LAW

### A.  *Arbitration*

#### 1.  The Act

AMF characterizes the settlement agreement as one subject to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* The Act provides for enforcement of agreements to "settle" disputes arising after the agreement was entered into. In relevant part it reads:

> A written provision in ... a contract evidencing a transaction involving commerce to *settle by arbitration* a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (1982) (emphasis supplied). The issue posed is whether "a controversy" would be "settled" by the process set forth in the agreement.

Brunswick argues that the parties did not contemplate the kind of arbitration envisaged by the Act because the opinion of the third party is not binding on AMF and Brunswick and the agreement cannot settle the controversy. Arbitration, Brunswick argues, must present an alternative to litigation; that is, it must provide "a final settlement of the controversy between the parties."

Arbitration is a term that eludes easy definition. One commentator has pointed out that "difficulty with terminology seems to have persisted throughout the entire development of arbitration." G. Taylor, Preface to E. Witte, Historical Survey of Labor Arbitration vi (1952). He suggests that arbitration has become "synonymous with 'mediation' and 'conciliation.'" *Id.* Case law has done little to sharpen the definition. *See, e.g., City of Omaha v. Omaha Water Co.,* 218 U.S. 180, 194, 30 S.Ct. 615, 616, 54 L.Ed. 991 (1910) ("An arbitration implies a difference, a dispute, and involves ordinarily a hearing....").

The Federal Arbitration Act, adopted in 1925, made agreements to arbitrate enforceable without defining what they were. Contemporary cases provide a broad description of arbitration: "[a] form of procedure whereby differences may be settled." *Pacific Indemnity Co. v. Insurance Co. of North America*, 25 F.2d 930, 931 (9th Cir. 1928); *Berkovitz v. Arbib & Houlberg*, 230 N.Y. 261, 130 N.E. 288, 290 (1921). At no time have the courts insisted on a rigid or formalistic approach to a definition of arbitration.

Case law following the passage of the Act reflects unequivocal support of agreements to have third parties decide disputes—the essence of arbitration. No magic words such as "arbitrate" or "binding arbitration" or "final dispute resolution" are needed to obtain the benefits of the Act. *See City of Omaha v. Omaha Water Co.*, 218 U.S. 180, 194, 30 S.Ct. 615, 616, 54 L.Ed. 991 (1910) (dictum) ("a plain case of the submission of a dispute or difference which had to be adjusted ... was in fact an arbitration, though the arbitrators were called appraisers").

The history of the Federal Arbitration Act indicates a strong desire by Congress to reject the centuries-old "jealousy" of the courts which hindered the enforcement of contracts to have a non-judicial person decide disputes which otherwise might require adjudication by courts. *See* H.R.Rep. No. 96, 68th Cong., 1st Sess. at 1 (1924). In the words of the House report:

> Arbitration agreements are purely matters of contract, and the effect of the bill is simply to make the contracting party live up to his agreement. He can no longer refuse to perform his contract when it becomes disadvantageous to him.

*Id.*

As the Supreme Court pointed out in *Dean Witter Reynolds, Inc. v. Byrd*, — U.S. ——, 105 S.Ct. 1238, 1243, 84 L.Ed.2d 158 (1985), compelling arbitration "successfully protects the contractual rights of the parties and their rights under the Arbitration Act." As "a matter of federal law, any doubts concerning the scope of arbitra-

ble issues should be resolved in favor of arbitration....". *Moses M. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). *See also Allegaert v. Perot*, 548 F.2d 432, 437 (2d Cir.) ("judicial hostility to the arbitration process is, and should remain, a thing of the past"), *cert. denied*, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977); *City of Meridian, Miss. v. Algernon Blair, Inc.*, 721 F.2d 525, 527–28 (5th Cir.1983); *GAF Corporation v. Werner*, 66 N.Y.2d 97, 495 N.Y. S.2d 312, 485 N.E.2d 977 ("the Act is 'a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural problems to the contrary,'" *quoting Moses M. Cone Memorial Hospital, supra*, 460 U.S. at 24, 103 S.Ct. at 941).

An adversary proceeding, submission of evidence, witnesses and cross-examination are not essential elements of arbitration. *Cf.* P. Spiegelman, *An Introduction to the Lawyer's Role in Dispute Resolution* (unpublished manuscript attached to Petitioner's Supplemental Brief in Support of Its Petition for Arbitration as Exhibit 5) at 15. The Second Circuit has set a standard of "fundamental fairness" in arbitration; rules of evidence and procedure do not apply with the same strictness as they do in federal courts. *See Bell Aerospace Co. v. Local 516, UAW*, 500 F.2d 921 (2d Cir. 1974).

Arbitration is a creature of contract, a device of the parties rather than the judicial process. If the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration. The arbitrator's decision need not be binding in the same sense that a judicial decision needs to be to satisfy the constitutional requirement of a justiciable case or controversy. *Cf.* C.A. Wright, Law of Federal Courts 53 ff. (4th ed. 1983).

### 2. Application of the Act to the Facts

Under the circumstances of this case, the agreement should be characterized as one to arbitrate. Obviously there is a contro-

versy between the parties—is there data supporting Brunswick's claim of superiority. Submission of this dispute will at least "settle" that issue, even though the parties may want to continue related disputes in another forum.

It is highly likely that if Brunswick's claims are found by NAD to be supported that will be the end of AMF's challenge to the advertisement. Should the claims not be found to be supported, it is probable that Brunswick will change its advertising copy. Viewed in the light of reasonable commercial expectations the dispute will be settled by this arbitration. That it may not end all controversy between the parties for all times is no reason not to enforce the agreement.

The mechanism agreed to by the parties does provide an effective alternative to litigation, even though it would not employ an adversary process. That the arbitrator will examine documents in camera and ex parte does not prevent recognition of the procedure as arbitration since the parties have agreed to this special practice in this unique type of dispute. Courts are fully familiar with the practice since prosecutorial and business secrets often require protection by ex parte and in camera proceedings during the course of a litigation.

In a confidential-submission scheme, such as the one agreed to here, adversarial hearings cannot take place. But this fact does not militate against application of the Act. Rather it supports arbitration since the special arbitrator may be more capable of deciding the issue than is a court which relies so heavily on the adversary process. Moreover, the particular arbitrator chosen by these parties is more capable than the courts of finding the faint line that separates data supported claims from puffery in the sometimes mendacious atmosphere of advertising copy.

### B. Contract to Employ an Alternative Dispute-Resolution Mechanism

### 1. Consent Agreements as Enforceable Contracts

Whether or not the agreement be deemed one to arbitrate, it is an enforceable contract to utilize a confidential advisory process in a matter of serious concern to the parties. The agreement may be enforced in equity. Through the equitable relief of specific performance Brunswick may be compelled to surrender its "comparative data based" information to the NAD for inquiry as to deceptiveness.

The law of New York would apply since the settlement agreement was executed and filed in New York. *See Index Fund, Inc. v. Insurance Co. of North America,* 580 F.2d 1158, 1162 (2d Cir.1978), *cert. denied,* 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979) ("greatest interest" analysis favors application of New York law to contract dispute); *S.D. Hicks & Son Co. v. J.T. Baker Chemical Co.,* 307 F.2d 750 (2d Cir.1962) (contract made in New York and contemplating performance in New York governed by New York law).

New York would be likely to enforce such an agreement whose practical commercial benefits to both parties is so clear. In the memorable language of Judge Cardozo granting equitable relief in a contract action:

> The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today.... [T]he whole writing may be "instinct with an obligation," imperfectly expressed....

*Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917).

If the agreement's force is found in the fact that it was part of a settlement of a *federal* litigation so that, arguably, federal law applies, the result is no different. The Second Circuit has recently made clear the strong public policy requiring agreements between parties in settlement of litigation to be construed as enforceable contracts. *See Berger v. Heckler,* 771 F.2d 1556, 1568, (2nd Cir.1985). In the words of the Court of Appeals:

> A defendant who has obtained the benefits of a ... termination of the litigation

... cannot then be permitted to ignore such affirmative obligations as were imposed by the decree.

*Id.* at 1569. *Accord, Schurr v. Austin Galleries of Illinois,* 719 F.2d 571 (2d Cir. 1983). Undoubtedly this general rule is applicable in New York. *See Hallock v. State,* 64 N.Y.2d 224, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984); *Heimuller v. Amoco Oil Co.,* 92 A.D.2d 882, 459 N.Y.S.2d 868 (2d Dep't 1983); *Myers v. Bernard,* 38 A.D.2d 619, 326 N.Y.S.2d 279 (3d Dep't 1971) (stipulations of settlement to be construed as contracts).

The fact that the agreement terminating the litigation was not formally signed by the court does not affect enforceability. It is the agreement terminating the litigation, rather than the court's imprimatur, that gives rise to the obligation.

The settlement agreement evinces a clear intent by both parties to require confidential submission to the NAD of disputes concerning advertised data-based claims of superiority. This settlement facilitated the termination of AMF's lawsuit and Brunswick's counterclaim. Both parties bargained for and benefited from the stipulation.

## 2. Equity Jurisdiction

■ Untenable is the defendant's argument that there is an adequate remedy at law so that equity is without jurisdiction. Specific performance is available as a remedy where the remedy at law is not appropriate if such equitable relief will not force a "vain order." *See, e.g., Union Pacific Railroad Co. v. Chicago, R.I. & P.R. Co.,* 163 U.S. 564, 16 S.Ct. 1173, 41 L.Ed. 265 (1896); *Pennington v. Ziman,* 13 A.D.2d 769, 216 N.Y.S.2d 1 (1st Dep't 1961); Restatement (Second) of Contracts, §§ 357–366 (1981).

The agreement itself recognized that the legal process would not adequately address the parties' needs. Through their contract the parties have identified an "injury" sufficient to require the dispute resolution mechanism they thought most appropriate.

The alternative dispute resolution (ADR) procedure agreed upon in the settlement is designed to reduce the acrimony associated with protracted litigation and to improve the chances of resolving future advertising disputes. This form of ADR is designed to keep disputes of this kind out of court.

The value of this settlement agreement lies largely in the particular experience and skill of the NAD as a resolver of disputes. In the fourteen years since its formation, the NAD has developed its own process of reviewing complaints of deceptiveness, coupling relative informality and confidentiality with safeguards to ensure procedural fairness. *See NAD Guide for Advertisers and Advertising Agencies,* attached to Petitioner AMF's Supplemental Brief in Support of Its Petition for Arbitration as Exhibit 2. As the NAD puts it: "Speed, informality and modest cost are three chief benefits of [this] self-regulatory system." *Id.* at 3. To these advantages of the special ADR system designed by the parties is added the unique ability of the NAD to decide what is fair in advertising. A judge might make this inquiry, but ultimately it would have to defer to the very expertise that NAD offers without resort to the courts.

General public policy favors support of alternatives to litigation when these alternatives serve the interests of the parties and of judicial administration. Here AMF and Brunswick agreed in June 1983 that a special ADR mechanism would serve them better than litigation. Such decisions are encouraged by no less an observer than the Chief Justice of the United States. In his words, ADR devices are often superior to litigation "in terms of cost, time, and human wear and tear." Remarks of Warren E. Burger, Chief Justice of the United States, at the Twin Cities Advisory Council of the American Arbitration Association, St. Paul, Minn., August 21, 1985. *See also, e.g.,* J. Marks, E. Johnson & P. Szanton, Dispute Resolution in America 25–50 (1984); Center for Public Resources, A Manual of Innovative Corporate Strategies for the Avoidance and Resolution of Legal Disputes (1980); Bush, Dispute Resolution

Alternatives and the Goals of Civil Justice: Jurisdictional Principles for Process Choice, 1984 Wis.L.Rev. 893, 973–94 (comparing costs of adjudication with those of alternative dispute resolution processes); Falsgraf, Towards Swifter Justice, ABA Journal, Nov. 1985, p. 8 ("use of alternative dispute resolution mechanisms will ultimately make more justice available to more people, with less expense and less delay").

As suggested by the "Plan for Court-Annexed Arbitration, United States District Court, Eastern District of New York," effective January 1, 1986, the specific policy of this court is to enforce ADR agreements. In most instances they reduce the need for court trials and save clients time and money.

A remedy at law would be inadequate since it could only approximate the skilled, speedy and inexpensive efforts available by way of specific performance. A law suit would deny AMF the practical specialized experience that the parties agreed to have available for an examination of data-based comparative advertising. A court decision and an NAD decision would have different effects on the parties' reputations within the bowling products industry. In short, a remedy at law falls short of providing many of the advantages of specific performance.

To deem specific performance "a vain order" would be to say that AMF and Brunswick settled their earlier litigation with a nullity. This characterization of a valid settlement agreement filed in court is unwarranted. *Cf. Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir.1983); *Artvale, Inc. v. Rugby Fabrics Corp.,* 303 F.2d 283 (2d Cir.1962) (judicial reluctance to scrutinize merits of bargain in consent decrees).

### IV. CONCLUSION

■ The new advertisement is not so explicit in denigrating the competitor's product as the former advertisements that were subject to the prior litigation. But for the readers—purchasers of bowling alleys—the effect is much the same. The current dispute is at least as important to the parties as the former one that resulted in litigation, a settlement, and an agreement on a process for resolving further disputes about advertising.

AMF's petition to compel the submission of data pursuant to Paragraph 9 of the settlement agreement of June 30, 1983 is enforceable under the Federal Arbitration Act and pursuant to this court's equity jurisdiction.

Brunswick shall submit its substantiation for the following claim: "Continuing independent research projects that Armor Plate 3000 will now last over 20 years before the possible need arises to replace a small lane area much like replacing a broken board in a wood lane" to the National Advertising Division of the Council of Better Business Bureaus, Inc., for an advisory opinion as provided for in Paragraph 9 of the Agreement of June 30, 1983.

So Ordered.