642 A.2d 889

ANNAPOLIS PROFESSIONAL FIREFIGHTERS
LOCAL 1926, IAFF, AFL–CIO, et al.

v.

CITY OF ANNAPOLIS.

No. 1552, Sept. Term, 1993.

Court of Special Appeals of Maryland.

June 10, 1994.

William W. Thompson, II (Zwerdling, Paul, Leibig, Kahn, Thompson & Driesen, P.C., on the brief), Washington, DC, for appellants.

Jonathan A. Hodgson (Snider, Buck & Migdal, Chartered, on the brief), Annapolis, for appellee.

Argued before WILNER, C.J., CATHELL, J., and JOHN F. McAULIFFE, Judge (retired), Specially Assigned.

WILNER, Chief Judge.

The union representing firefighters employed by the City of Annapolis appeals from an order of the Circuit Court for Anne

Arundel County declining to enter a preliminary injunction against the City and dismissing the union's complaint.[1] The underlying dispute is whether lieutenants and captains in the fire department are supervisory personnel and, for that reason, ineligible for inclusion within the bargaining unit. The City now claims they are; the union asserts they are not. The issue before us is whether the court erred in refusing to enjoin the City from taking that issue to impasse and then unilaterally removing lieutenants and captains from the unit. Under the circumstances of this case, we hold that the court did not err.

## Underlying Facts

The City of Annapolis has an ordinance governing employee-management relations—Chapter 3.32 of the City Code. It affords City employees, including firefighters, the right to self-organization and collective bargaining (§ 3.32.030) and provides for recognition of a union as the exclusive employee representative if, at an election held for the purpose, a majority of the employees in the "appropriate unit" desire to be represented by the union (§ 3.32.050 B). When a union has been so recognized, it has the exclusive right to represent "all employees in the unit for the purpose of collective negotiation with respect to the terms and conditions of employment...."

Section 3.32.010 defines "appropriate unit" as:

"a group of employees recognized as appropriate for representation, using such criteria as similarity of job duties, skills, wages, educational requirements, supervision, hours of work, job location and working conditions, by an employee organization."

One caveat to that definition is the provision in § 3.32.050 C that no unit shall be deemed appropriate "if it includes both supervisory and nonsupervisory personnel."

---

1. The complaint was filed by the union and two of its officers. For the sake of convenience, we shall refer to appellants collectively as the union.

Section 3.32.070 declares certain conduct on the part of the City or a union to constitute a prohibited unfair labor practice. The City, in particular, is prohibited from interfering with employees in the exercise of their right of self-organization and from refusing to negotiate in good faith with a recognized employee organization. That section further provides that any dispute as to whether the City or a union has committed an unfair labor practice is to be resolved by § 3.32.070 B to the State Mediation and Conciliation Service. The complaining party is directed to file a verified complaint with that unit which, after an investigation and hearing, is authorized in the ordinance to determine whether an unfair labor practice was committed and, if so, to enter an order requiring the offending party to desist and to take other affirmative action. The section provides further that, where the conduct may constitute both an unfair labor practice and a grievance, the aggrieved party may file either an unfair labor practice or a grievance, but not both.

The State Mediation and Conciliation Service is a statutory unit within the State Division of Labor and Industry. Md. Code Labor & Empl. art., § 2–107(b). The duties of the Service are set forth in title 4, subtitle 1 of the article and include the mediation of labor disputes and, where the parties agree, establishing arbitration boards to arbitrate such disputes.[2] If mediation fails and a disputant refuses to arbitrate,

---

**2.** The State has provided this service since 1904. In that year, by 1904 Md.Laws, ch. 671, the Legislature authorized the Chief of the Bureau of Industrial Statistics of Maryland, upon being apprised of a dispute between an employer and employees involving 10 or more persons that may result in a strike or lockout to visit the place of the controversy and "seek to mediate between the parties, if in his discretion it is necessary to do so." The statute further provided that, if mediation could not be effected, the Chief or his designee may endeavor to obtain the consent of the parties to arbitration. It provided for the formation of an arbitration board, gave such a board power to summon witnesses, enforce their attendance, administer oaths, "and determine the matter in dispute." The award of the board was declared to be "final."

Section 4 of the Act permitted the parties to agree to a form of arbitration different than that provided for in the Act. It declared any

the Service is authorized to conduct an investigation, decide "which disputant is mainly responsible or blameworthy for continuance of the dispute," and, over the signature of the Commissioner of Labor and Industry or the Chief Mediator, "publish in a daily newspaper a report that assigns responsibility or blame for the continuance of the dispute." *Id.* at § 4–108. Section 3.32.070 of the City Code obviously invoked the jurisdiction of this State unit.

The City has had a collective bargaining agreement with the union for some period of time. During all of that time, the appropriate unit has included captains and lieutenants, notwithstanding the prohibition in § 3.32.050 C against mixing supervisory and nonsupervisory personnel in the same unit. Indeed, in the most recent (1990–93) agreement, the City expressly recognized the union as the sole and exclusive bargaining agent for "all eligible employees in the Annapolis Fire Department in the rank of firefighter through captain pursuant to the provisions of ... Section 3.21.050 of the Annapolis City Code." At least implicit, if not explicit, in this is an historical recognition by the City that captains and lieutenants, despite the common perception of positions so designated, are not supervisory personnel.

The most recent contract between the City and the union became effective July 1, 1990 and was due to expire on June 30, 1993, subject to the provision in art. 27 of the contract that it would "automatically be renewed from year to year hereafter unless a successor to this agreement is executed by the parties hereto."[3] Art. 27 also provided that, should either party desire to modify the agreement, it would have to notify the other party at least 120 days prior to June 30, 1993. Such

---

such agreement valid and the award rendered "final and conclusive between the parties."

The current statutory provisions are not very different than those enacted in 1904.

**3.** The validity of that clause was also challenged by the City. The circuit court declared it void as against public policy. The correctness of that ruling has not been raised as an issue in this appeal.

notice would trigger the duty to negotiate the proposed changes. Article 28 provided:

"If after a reasonable period of negotiations over the terms of an agreement, a dispute exists between the City and the Union, the parties may mutually agree that an impasse has been reached; except that if such dispute exists as of May 1, 1993 an impasse shall be deemed to have been reached. Whenever an impasse has been reached, the dispute shall be submitted to mediation. If the parties are unable to agree to a mediator the Division of Mediation and Conciliation shall be required to provide a mediator. The parties hereto agree, that should the mediator recommend the process of fact-finding, that process shall be used in an advisory manner."

Negotiations over a new contract began in April, 1993. During the negotiations, the City, for the first time, contended that captains and lieutenants were supervisory personnel and therefore ineligible for inclusion in the same bargaining unit as the rest of the firefighters. The Union rejected that contention but continued to negotiate other matters.

As the expiration date of the agreement approached, the City announced that it would extend the term of the existing agreement for two weeks to allow time for the parties to reach agreement on a new contract. Subsequently, the City made what it termed its "Final Proposal." In that offer, the City proposed that lieutenants could remain in the bargaining unit until October, 1993, while the question of their supervisory status would be referred to a third party for decision; captains, however, would be removed from the unit. The Union rejected that proposal and, subject to the automatic extension provision in art. 27, the collective bargaining agreement expired without a successor agreement having been reached. The City, giving no effect to the automatic extension provision in art. 27, then announced that the collective bargaining agreement had expired, that the parties were at an impasse, and that captains and lieutenants would thereafter be excluded from the bargaining unit. The City also explicitly withdrew

its offer to have a third party determine the supervisory status of the lieutenants.

Initially, the Union filed a verified complaint of unfair labor practices with the Division of Labor and Industry. It complained about a number of things, including the City's removal of captains and lieutenants, noting that, of the 80 members of the unit, 22, or more than 25%, were captains or lieutenants. Indeed, the president and secretary of the union, who comprised two-thirds of the union's negotiating committee, were lieutenants. By unilaterally removing such personnel, the union claimed, the City was interfering with the employees' right of self-organization and refusing to negotiate in good faith.

On July 26, 1993, the Commissioner of the Division of Labor and Industry sent appellants a letter stating:

"As you know, the Mediation and Conciliation Service was once a unit of the Division of Labor and Industry. Due to state budget cuts, the unit was abolished on July 1, 1991, and remains disbanded to date. Accordingly, the entity the City Ordinance authorizes to process the unfair labor practice charge does not exist."

The Commissioner also asserted that the Division would not assert jurisdiction over the charge as the ordinance did not impose an obligation on the State to do so and the Division lacked resources to devote to the matter.[4]

The union then filed in the Circuit Court for Anne Arundel County a complaint for injunctive relief asserting, among other things, that it was "without an adequate administrative

---

**4.** According to the 1992 Evaluation Report prepared by the State Department of Fiscal Services pursuant to the Program Evaluation Act:

"The Mediation and Conciliation Program was another casualty of Maryland's recent fiscal crisis. The program was eliminated in the Governor's budget for fiscal year 1992. Prior to that time, program staff mediated and arbitrated public sector labor disputes and supervised elections. The program also maintained a list of all the collective bargaining agreements in effect throughout the state. Currently, the division has suspended all activities in these areas, though the authorizing laws remain on the books."

remedy or remedy at law to enforce their rights," that the unilateral removal of fire lieutenants and captains from the bargaining unit "void[ed] their opportunity to participate through collective bargaining in the setting of their terms and conditions of employment," "cause[d] grave harm to the organization and structure of the [union]," and "violate[d] each and every plaintiff's rights to due process." Accordingly, in order to preserve the status quo, it requested a preliminary injunction to restrain the City from unilaterally removing lieutenants and captains from the bargaining unit. In a memorandum filed in support of the complaint, the union repeated the claims it had made in its unfair labor practice charge and asserted further that the unilateral removal violated the captains' and lieutenants' due process rights under the U.S. Constitution and the Maryland Declaration of Rights.

The City responded with a motion to dismiss, arguing, in relevant part, that: (1) the court lacked jurisdiction because the creation of new remedies for violations of the collective bargaining ordinance was for the City Council, not the courts, (2) Maryland's Anti–Injunction Act (Md.Code Labor & Empl. art. §§ 4–301 *et seq.*) prohibits courts from granting injunctive relief in this sort of labor dispute, (3) sovereign immunity barred the Union's claim, (4) the complaint failed to state a claim upon which relief could be granted, (5) the lieutenants and captains lacked a "due process" right to be represented by a union, and (6) the plaintiffs did not allege an immediate irreparable injury that could not be adequately compensated with money.

After a hearing, the court entered an order denying the request for preliminary injunction and dismissing the complaint. In the order, the court declared, in relevant part:

"1.   There is no legal authority known to the Court which would support the issuance of an injunction against Defendant under the circumstances alleged in the Complaint;

2.   As a result of the abolition of the State Mediation and Conciliation Service named in the City of Annapolis' collective bargaining ordinance, § 3.32.070 of the Annapolis City

Code, Plaintiffs may seek relief from alleged unfair labor practices on the part of Defendant, including the issue of the exclusion of fire captains and fire lieutenants from the Annapolis Professional Firefighters' bargaining unit, by addressing their claims to the Annapolis City Council.

\* \* \* \* \* \*

4. Injunctive relief is inappropriate because Plaintiffs have failed to establish that they will suffer immediate, irreparable injury which cannot be readily, adequately and completely compensated with money."

In this appeal, the union raises the single question, "Did the Court below err in failing to grant injunctive relief prohibiting the City of Annapolis from unilaterally excluding Fire Lieutenants and Fire Captains from the collective bargaining unit represented by [the union]?"

## *Discussion*

The ultimate substantive issue in dispute is whether captains and lieutenants are supervisory personnel within the meaning of § 3.32.050 of the City Code. The intermediate issue is whether it is an unfair labor practice for the City unilaterally to impose its interpretation of § 3.32.050 and restructure the existing bargaining unit by removing captains and lieutenants after taking the issue to impasse. The immediate issue is whether the circuit court was obliged to enjoin the City from continuing that conduct and thus, in doing so, effectively decide both the intermediate and the ultimate substantive issues.

In enacting Chapter 3.32, and agreeing to art. 28 of the collective bargaining agreement, the City understood the obvious—that, in the course of collective bargaining, disputes could arise that the parties might not be able to resolve efficiently through unassisted bilateral negotiations. Two areas, or categories, of disputes were particularly recognized—an impasse in negotiating a new agreement and a claim of unfair labor practice. In both instances, a common and sensible way of resolving such disputes was chosen—referral

to the State Mediation and Conciliation Service, a unit created by the Legislature for precisely this purpose. The agreement with the union was obviously subject to the ordinance and indeed made several references to it. The impasse provisions of art. 28, dealing with a breakdown in negotiating a new agreement, are entirely consistent with § 3.32.070 of the ordinance, calling for mediation of any dispute over an unfair labor practice charge.

■ What we have then is a legislative direction and a voluntary written agreement to submit the very kind of dispute that arose in this case to mediation,[5] and, failing that, to neutral fact-finding. In *Anne Arundel County v. Fraternal Order*, 313 Md. 98, 543 A.2d 841 (1988), a similar kind of dispute arose between the county and the police union— whether a detention center lieutenant could be included in the bargaining unit with lower level detention center employees. The issue before the Court was whether the county could be required to submit that dispute to arbitration under an arbitration clause in the collective bargaining agreement.

Recognizing that the agreement was not subject to the State Uniform Arbitration Act and assuming that no other statute authorized the arbitration clause, the Court overruled existing common law and held the clause valid under Maryland common law. At 107, 543 A.2d 841, it stated the new holding: "We believe that agreements to arbitrate future disputes

---

**5.** As we noted, the question of whether the City can unilaterally remove captains and lieutenants from the bargaining unit is an intermediate issue in this overall dispute, and it is one that we shall not decide in this appeal. We do note, however, that, under Federal labor law and policy, (1) the scope of an employees' bargaining unit is regarded as a permissive subject of collective bargaining, (2) once a specific job has been included in a bargaining unit by consent of the parties, the employer may not modify the scope of the unit without the consent of the union, (3) either party may propose changing the scope of the unit so long as it does not insist on its proposal to the point of impasse, and (4) taking the issue to impasse and then unilaterally changing the unit is regarded as an unfair labor practice on the part of the employer. *See Boise Cascade Corp. v. NLRB*, 860 F.2d 471 (D.C.Cir.1988); *Hill–Rom Co. v. NLRB*, 957 F.2d 454 (7th Cir.1992); *The Developing Labor Law* (Patrick Hardin ed., 3d ed. 1992), at 605.

generally should be enforceable even in the absence of a specific statutory provision." This was consistent with the Court's more general and often-expressed view that "arbitration is a favored method of dispute resolution." *Id.* at 105, 543 A.2d 841; also *Bd. of Educ. v. P.G. Co. Educators' Ass'n,* 309 Md. 85, 522 A.2d 931 (1987). More specifically, the Court held that a determination "as to which representation unit is appropriate for a certain group of employees" was a proper subject for arbitration as it "merely permits the Union to bargain with the County on behalf of the employees."

Section 3.32.070 and art. 28 of the agreement are not, strictly, arbitration provisions. They look rather to mediation and, failing that, neutral fact-finding, which are and have long been equally well-recognized and beneficial methods of dispute resolution, especially in labor disputes. As we have observed, the Legislature blessed this mechanism in this very context as early as 1904. For disputes that are susceptible to it, mediation and neutral evaluation have become, throughout the nation and increasingly throughout this State, equally "favored method[s] of dispute resolution," and we can see no rational basis for not enforcing agreements to utilize such methods in much the same manner as agreements to arbitrate are enforced.

The United States District Court for the Eastern District of New York reached the same conclusion in *AMF, Inc. v. Brunswick Corp.,* 621 F.Supp. 456 (E.D.N.Y.1985). The parties, in an earlier settlement agreement ending litigation over false advertising claims, agreed that future disputes over certain advertised claims would be submitted to the National Advertising Division of the Council of Better Business Bureaus (NAD) for an advisory determination of whether there was support for the claim. Such a dispute arose, and, when Brunswick refused to submit its data to the NAD, AMF sued to enforce the agreement. Though recognizing that the non-binding dispute resolution mechanism chosen by the parties was not arbitration in the traditional sense, the court nonetheless regarded it an being in the nature of arbitration and enforced the agreement. At 461, it said:

"Viewed in the light of reasonable commercial expectations the dispute will be settled by this arbitration. That this might not end all controversy between the parties for all times is no reason not to enforce the agreement.

The mechanism agreed to by the parties does provide an effective alternative to litigation, even if it would not employ an adversary process."

Against the argument that the "arbitrator" will have to examine evidence *in camera* in order to protect trade secrets, the court responded:

"[This] supports arbitration since the special arbitrator may be more capable of deciding the issue than is a court which relies so heavily on the adversary process. Moreover, the particular arbitrator chosen by these parties is more capable than the courts of finding the faint line that separates data supported claims from puffery in the sometimes mendacious atmosphere of advertising copy."

*Id.* at 461.

■ The *AMF* court stretched to find this process one of arbitration because of its view that the enforceability of the clause depended on whether the Federal Arbitration Act was applicable. We need not make that stretch. We believe that, as a matter of Maryland common law, consistent with the liberal approach now taken to alternative dispute resolution agreements generally, a written agreement to submit either an existing or a future dispute to a form of alternative dispute resolution that is not otherwise against public policy will be enforced at least to the same extent that it would be enforced if the chosen method were arbitration.[6]

---

**6.** We recognize that alternative dispute resolution is an evolving concept and that new mechanisms, often borrowing on more traditional methods, are being created. Although we would not likely be inclined to enforce an agreement to resolve a dispute through trial by combat or ordeal, we do not wish to put a straightjacket on the creative development of new forms of alternative dispute resolution that individual parties, or industries, find useful and preferable to litigation.

■ What we then have is a dispute for which the parties have chosen a specific, enforceable dispute resolution process. The only "fly in the ointment" is that, because of lack of funding, the agency selected to mediate the dispute or, failing mediation, to engage in neutral fact-finding, has become non-operational (though still provided for in the State Code) and therefore, as a practical matter, unavailable. The question is whether that unfortunate fact vitiates the chosen process entirely, thereby either leaving the parties without a remedy or requiring the courts to reenter an area from which they have largely, and wisely, been excluded for the past six decades.

There is no reason to vitiate the chosen process, and it makes no sense to do so. The Uniform Arbitration Act (Md.Code Cts. & Jud.Proc. art., § 3–211) requires that, if an arbitration agreement provides a method for the appointment of arbitrators, that method shall be followed, but that a court shall appoint one or more arbitrators if "[t]he agreed method fails or for any reason cannot be followed." The statute further states that a court-appointed arbitrator "has all the powers of an arbitrator specifically named in the agreement."

Although this power, under the Act, is a statutory one, it is not foreign to or inconsistent with the general equitable jurisdiction of a circuit court. Equity courts have long had the power, for example, when specifically enforcing agreements, to appoint trustees to carry out their decrees when a party proves recalcitrant or when otherwise necessary to implement the agreement. As early as 1847, it was established in Maryland that:

"Courts of equity are not, in the dispensation of justice, subject to those strict technical rules, which in other Courts are sometimes found in the way, and so difficult to surmount.... If such a decree can be put upon the record as will meet the substantial justice of the case, it will be done."

*Crain v. Barnes*, 1 Md.Ch. 151, 155 (1847).

This principle was affirmed in *Hanley v. Stulman*, 212 Md. 273, 129 A.2d 132 (1957), where the Court added, at 277, 129 A.2d 132:

"The arm of an Equity Court is not so short, nor its authority so impotent, that it must permit a defendant to evade, with impunity, the broad and salutary principle of law that one cannot profit by his own wrongdoing. There is an ancient maxim in Equity that says: 'Equity will not suffer a wrong without a remedy.' This principle, which is the somewhat restricted application to the equity jurisprudence of the more comprehensive legal maxim, *Ubi jus, ibi remedium,* is the source of the entire equitable jurisdiction."

Upon this analysis, it is clear that, had such a remedy been requested by the union, the court could have designated a substitute mediator/neutral fact-finder in light of the parties' inability or unwillingness to agree themselves upon a substitute for the nonfunctional State Mediation and Conciliation Service. Unfortunately, except to the extent included within the union's general prayer for relief, that request was not made. The only specific relief sought was an injunction, the effect of which would have been to retain captains and lieutenants within the bargaining unit until such time, if ever, that the county council, by amendment to the ordinance, declared such positions to be supervisory.

It is, of course, axiomatic that, except in compelling circumstances, the issuance or denial of an injunction rests within the sound discretion of the equity court, and that considerable latitude is afforded to trial judges in exercising that discretion. *Tyler v. Secretary of State,* 230 Md. 18, 20, 185 A.2d 385 (1962).

In deciding whether the court here abused that discretion, we may take cognizance of both the general policy of the State to avoid injunctions in labor disputes and the fact that a better alternative was available in this particular case. As to the former, whether or not this particular dispute was formally subject to the anti-injunction provisions of Md.Code Labor & Empl. art., title 4, subt. 3, the issuance of such an injunction, given its practical effect, would certainly have been inconsistent with the general policy established by the Legislature in that part of the Code. We note, in that regard, § 4–302(b)

expressing the policy of the State that "negotiation of terms and conditions of employment should result from voluntary agreement between employees and employer" and § 4–313 providing that, except where irreparable injury is threatened, a court may not grant injunctive relief in a labor dispute "if the plaintiff has failed to make every reasonable effort to settle the labor dispute . . . with the help of available dispute resolution mechanisms, governmental mediation, or voluntary arbitration."

As to the latter, for the reasons we have explained above, the union, and upon its request, the court, had a viable, less intrusive, and more appropriate alternative to the injunctive relief sought in this case. It is for these reasons that we shall affirm the judgment below, without prejudice to either party seeking further relief in the circuit court consistent with this Opinion.

JUDGMENT AFFIRMED;

APPELLANTS TO PAY THE COSTS.