**BENSON PUMP CO., now known as Mt. Rose Capital, Inc., an Illinois corporation, Plaintiff,**

v.

**SOUTH CENTRAL POOL SUPPLY, INC., a Delaware corporation, Defendant.**

**No. CV–N–02–414–ECR(RAM).**

United States District Court, D. Nevada.

June 7, 2004.

Pat Lundvall, Reno, NV, for Plaintiff.

Covert J. Geary and Genevieve Hartel of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Bruce Beesley, Reno, NV, for Defendant.

## ORDER

McQUAID, United States Magistrate Judge.

Before the court is Defendant's Motion to Compel Arbitration (Doc. # 11). Plaintiff has opposed the motion (Doc. # 37) and Defendant has replied (Doc. # 38). For the reasons set forth below, Defendant's Motion to Compel Arbitration is granted.

## BACKGROUND

On January 8, 1999, Defendant South Central Pool Supply ("SCP")[1] entered into an Asset Purchase Agreement ("the Agreement") with Plaintiff Benson Pump Co. ("Benson Pump")[2], a small chemical corporation, to purchase "substantially all" of Benson Pump's business assets (Doc. # 11, Ex. 1; Doc. # 37 at 3). The purchase negotiations between SCP and Benson Pump were kept secret until the closing. Immediately after the closing, SCP assumed full control over all of Benson Pump's business locations and operations, and all but a few former Benson Pump employees became SCP employees (Doc. # 37 at 3).

Because the negotiations were kept secret until closing, the payments to Benson

1. SCP is now known as SCP Distributors, L.L.C..

2. Benson Pump is now known as Mt. Rose Capital, Inc..

Pump at closing were based on estimated numbers, with a final reconciliation and final payment determination to take place after the closing, and after SCP completed various reviews (*Id.*). Specifically, SCP agreed to pay Benson Pump a "Base Purchase Price" of $2.5 million plus or minus the amount of any adjustments listed in the Agreement, including an "Accounts Receivable Adjustment" (*Id.*). SCP and Benson agreed that disputes concerning the Accounts Receivable Adjustment would be taken to an independent auditor for resolution using the same dispute resolution procedures to be used in determining the Base Purchase Price (Doc. # 11, Ex. 1: Asset Purchase Agreement at § 1.5(e)). The Agreement's dispute resolution procedures provide that:

> If [Benson Pump] disagree[s] with [SCP's'] determination of the Base Purchase Price, [Benson Pump] shall notify [SCP] in writing of such disagreement within twenty (20) days. Such writing shall be accompanied by a written notice from [Benson Pump's] accountants setting forth the basis for such disagreement in reasonable detail. [SCP] and [Benson Pump] thereafter will negotiate in good faith to resolve any such disagreements. If [SCP] and [Benson Pump] are unable to resolve any such disagreements within twenty (20) days after the delivery of [Benson Pump's] objection letter, [SCP] and [Benson Pump] will submit such dispute for resolution to an [sic] independent, nationally-recognized accounting firm mutually agreeable to [SCP] and [Benson Pump]. If [SCP] and [Benson Pump] are unable to mutually agree on such accounting firm, a nationally-recognized firm will be selected by lot after eliminating one firm designated as objectionable by each of [SCP] and [Benson Pump] ( . . . ).

(*Id.* at § 1.4(c)). The Agreement further requires that the independent auditor resolve all disagreements within 60 days and that the independent auditor's determination is "final and binding" on both parties (*Id.* at § 1.4(d)). In addition, Benson Pump and SCP verbally agreed that outstanding receivables collected after the closing date would be deposited directly into Benson Pump's bank account, but that Benson Pump would immediately remit these sums to SCP (Doc. # 38 at 4).

Negotiations did not proceed smoothly after the closing date, however, as the parties disagreed over the Base Purchase Price, the Accounts Receivable Adjustment, and the amount Benson Pump owed SCP for account receivables deposited into Benson Pump's account after the closing date. In May 1999, A. David Cook, SCP's Vice President, and other SCP representatives met with Benson Pump's representatives to try an resolve their disagreements (Doc. # 37 at 5). As a result, SCP offered to settle the "purchase variance" disagreement on May 17, 1999 with SCP immediately paying Benson Pump $94,664 and agreeing to release the $500,000 held in escrow (*Id.*, Ex. A). The accounts receivable issue was expressly excluded from this agreement as a "separate issue" yet to be reconciled (*Id.*). Benson Pump accepted the offer on May 18, 1999 (*Id.*). SCP subsequently sent a letter to the escrow agent on May 26, 1999 instructing the agent to release the entire escrow account to Benson Pump (*Id.*).

However, SCP never payed Benson Pump the $94,664 and never released the escrow funds as had been agreed to in the May 18 settlement agreement (*Id.* at 5). According to SCP, it had authorized the release of the escrow funds for approximately two months, but Benson Pump failed to take any action to obtain those funds (Doc. # 38 at 6). At the end of the two months, Benson Pump had still not given SCP the accounts receivable that it had collected on SCP's behalf after the

closing (*Id.* at 7). As a result, SCP instructed the escrow agent not to release the funds until Benson Pump remitted the receivables to SCP (*Id.*). SCP also denied that Cook, who signed both the May 18th agreement and the May 26th letter for SCP, was authorized to release the escrow funds (Doc. # 12 at ¶ 13).

Due to SCP's failure to comply with the May 18, 1999 settlement agreement, Benson Pump filed the instant action against SCP, alleging breach of contract and seeking declaratory relief to enforce the settlement agreement and the May 26, 1999 escrow instructions (Doc. # 2c). Benson Pump originally filed its complaint in the Second Judicial District Court of Nevada on July 2, 2002. SCP subsequently removed the action to this court on August 5, 2002 (Doc. # 2a), and filed its Answer, Counterclaim, and Third Party Complaint [3] on September 3, 2002 (Doc. # 12). SCP's Counterclaim and Third Party Complaint allege that Benson Pump breached the Asset Purchase Agreement by making material misrepresentations about the fixed assets and by failing to follow generally accepted accounting principles (GAAP) (*Id.* at ¶¶ 34–43). SCP also alleges breach of the closing agreement, conversion, and unfair trade practices due to Benson Pump's failure to remit to SCP all outstanding account receivables that it collected after the January 8, 1999 closing (*Id.* at ¶¶ 44–52).

In the instant motion, SCP is moving to compel arbitration of the Accounts Receivable Adjustment calculation only, pursuant to Section 1.4(c) of the Asset Purchase Agreement. SCP contends this is an entirely separate issue from the claims for relief raised by both itself and Benson Pump in their respective complaints.

## DISCUSSION

### A. Federal Arbitration Act ("FAA")

█ Under the FAA, "[a] written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA embodies a clear federal policy in favor of arbitration. *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir.1999). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

█ "Case law following the passage of the [FAA] reflects unequivocal support of agreements to have third parties decide disputes—the essence of arbitration." *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1208 (9th Cir.1998) (quoting *AMF Inc. v. Brunswick Corp.*, 621 F.Supp. 456, 460 (E.D.N.Y.1985)). No magic words such as "arbitrate" or "binding arbitration" or "final dispute resolution" are required to obtain the benefits of the FAA. *Id.* In other words, if the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration. *Id.*

Here, the parties explicitly agreed that disputes concerning the Accounts Receivable Adjustment would be taken to an independent auditor for resolution. Such

---

**3.** SCP named Benson Pump–Georgia, Inc., now known as Mt. Rose Capital of Georgia, and J.K.K.T. Corp. as Third Party Defendants.

an agreement clearly reflects the parties' intent to submit claims concerning to Accounts Receivable Adjustment to arbitration. Benson Pump, however, contends that the arbitration agreement should not be enforced because: (1) SPC waived its right to arbitration; (2) an independent auditor should not be allowed to decide legal issues; and (3) the arbitrable and nonarbitrable claims are inextricably bound, and thus should be decided in the same forum.[4] The court will address each argument in turn.

## B. *Waiver*

■ Despite the FAA's strong federal policy in favor of enforcing arbitration agreements, a party may waive its right to compel arbitration, either expressly or by implication. *See Conover v. Dean Witter Reynolds, Inc.,* 837 F.2d 867, 868 (9th Cir. 1988) (per curiam) (noting that a party may waive right to arbitrate by acting in a manner inconsistent with right to arbitrate). However, a waiver will not be lightly inferred from a party's conduct because it is a contractual right and accordingly, the party claiming waiver bears a heavy burden. *See Britton v. Co-op Banking Group,* 916 F.2d 1405, 1412 (9th Cir. 1990). A party asserting waiver of a right to arbitration must demonstrate: (1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts. *Id.*

■ SCP was aware of its right to arbitrate, as is evidenced in the letters from SCP's President Manual Perez de la Mesa to Benson Pump suggesting that the parties go to arbitration if no further progress could be made. *See* Doc. # 11, Ex. 2. Benson Pump, however, argues that SCP

waived its right to arbitration when it failed to demand that the accounts receivable dispute be submitted to arbitration within 20 days of Benson Pump's letters objecting to SCP's account receivables determination. While Section 1.4(c) provides that the parties must submit to arbitration within 20 days if they are unable to resolve their disagreement, the records submitted indicate that SCP suggested arbitration several times between the closing date and July 2002 when Benson Pump's complaint was filed. Indeed, SCP asserts that it requested that the parties submit their accounts receivable dispute to arbitration at least eleven times, but that Benson Pump refused. SCP's repeated requests for arbitration are not inconsistent with its present motion to compel arbitration, and if anything, show that Benson Pump prevented SCP from complying with the precise terms of the Agreement by ignoring or refusing these requests.

Benson Pump has also failed to demonstrate that it was prejudiced in any way by the failure to submit to arbitration within 20 days. Benson Pump was aware beginning in 1999 that SCP was interested in submitting the accounts receivables dispute to an independent consultant. Additionally, SCP filed its motion to compel arbitration on the same day it filed its Answer and Counterclaim. Thus, Benson Pump cannot argue that there was any delay that caused it prejudice in this litigation.

■ Finally, the court notes that according to the Ninth Circuit, timeliness of a motion to compel arbitration is a procedural question to be decided by the arbitrator, not the court. *See Retail Delivery Drivers v. Servomation Corp.,* 717 F.2d 475, 478 (9th Cir.1983); *see also Goss*

---

4. Benson Pump also argues that it's claim alleging breach of the May 18, 1999 settlement agreement is not arbitrable. SCP does

not dispute this point, nor does it seek to arbitrate this issue (Doc. # 38 at 19).

*Golden West Sheet Metal, Inc. v. Sheet Metal Workers Int'l Union, Local 104,* 933 F.2d 759, 763–64 (9th Cir.1991). Nevada, which has adopted the Uniform Arbitration Act, has similarly held that timeliness of an arbitration demand is a generally a "procedural condition" to be determined by the arbitrator. *See Exber v. Sletten,* 92 Nev. 721, 558 P.2d 517, 522 (1976). According to the *Exber* court, timeliness may be an issue for the court, but only if the untimeliness constituted a repudiation of the arbitration agreement. Untimeliness, however, only constitutes repudiation where the party acts so inconsistently with the arbitration agreement as to waive its right to proceed under the agreement. *Id.* As discussed above, SCP's failure to submit to arbitration within 20 days was due in large part to Benson Pump's failure to comply, and Benson Pump has suffered no prejudice as a result of the delay. Accordingly, SCP has not waived its right to compel arbitration of the Accounts Receivable Adjustment issue.

### C. *Power of an Independent Auditor to Act as Arbitrator*

The arbitration clause in Sec. 1.4(c) provides that the parties will choose an "independent, nationally-recognized accounting firm" to resolve any disputes concerning the Base Purchase Price, including calculation of the Accounts Receivable Adjustment. Benson Pump, however, disputes the power of an independent auditor to act as an arbitrator and decide legal issues. The court finds this argument unpersuasive. SCP has cited several cases involving nearly identical language appointing independent auditors to act as arbitrators in resolving purchase price disputes. *See, e.g., CAE Indus. Ltd. v. Aerospace Holdings Co.,* 741 F.Supp. 388, 391 (S.D.N.Y.1989) ("[T]he specific matters in dispute shall be submitted to an independent accounting firm mutually agreeable to Buyer and Seller."). The district courts

deciding the respective motions to compel arbitration in each of these cases never questioned the propriety of designating an independent auditor to act as arbitrator, despite the apparent lack of any legal expertise.

Benson Pump nonetheless argues that even if the court allows an independent auditor to arbitrate the accounts receivable dispute, the auditor may not decide questions of law. The Supreme Court, however, has expressly held that interpretation of the underlying contract is an issue for the arbitrator to decide, even though contract construction is generally a question of law. *See United Steelworkers of Am. v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). In so holding, the Supreme Court reasoned that "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Id.*

Benson Pump, however, relies on *Thomas Crimmins Contracting Co., Inc. v. City of New York,* 138 A.D.2d 138, 142–47, 530 N.Y.S.2d 779 (1st Dep't 1988) to support its position that final-decision making authority with respect to legal questions should not be granted when the arbitrator is, as here, a non-legal expert. In *Thomas Crimmins,* the court refused to allow an engineer, designated to resolve certain disputes concerning a subway construction contract between the contractor and the city, to have final say over questions of contract construction because such questions were questions of law for the court. In reaching this conclusion, however, the court distinguished the engineer's role under the contract from a neutral arbitrator. The dispute resolution clause only required the contractor to submit its dis-

putes to the engineer for resolution, not the other parties to the contract. *See id.* at 146, 530 N.Y.S.2d 779. Additionally, the engineer was the city's agent and employee, and thus the engineer had no impartial judicial autonomy to settle questions of law and contract construction. *See id.* at 147, 530 N.Y.S.2d 779.

The instant action is distinguishable from *Thomas Crimmins* in two important respects. First, the arbitrator at issue in the instant action, unlike the engineer in *Thomas Crimmins,* is an *independent* auditor to be chosen by both parties. Second, the arbitration clause is mutually binding. Accordingly, the court finds that the parties bargained to have an independent auditor decide all issues concerning the Accounts Receivable Adjustment, including issues of contract construction. The court refuses to step-in and second guess that decision simply because Benson Pump now has concerns about its agreement.

**D. *Entwinement of Arbitrable and Non-arbitrable Claims***

 Finally, Benson Pump argues that arbitration should be denied because the arbitrable and nonarbitrable claims regarding the accounts receivable are inextricably bound, and thus should be decided in the same forum.[5] Specifically, Benson Pump is concerned that fractured litigation where one issue is arbitrated while remaining related issues are litigated will result in additional collateral estoppel and inefficiency concerns. This may be true, but does not mean that arbitration should be denied. Indeed, as SCP points out, the Supreme Court has directly addressed Benson Pump's concerns about collateral estoppel, inefficiency, and bifurcated proceedings and held that arbitration should move forward nonetheless. *See Dean Wit-*

*ter Reynolds Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). According to the Supreme Court, "[T]he [FAA] requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." *Byrd,* 470 U.S. at 217, 105 S.Ct. 1238. In so holding, the Supreme Court reasoned that the FAA divests the courts of any discretion regarding arbitration in cases containing both arbitrable and nonarbitrable claims. The FAA, "both through its plain meaning and the strong federal policy it reflects, requires courts to enforce the bargain of the parties to arbitrate, and 'not substitute its own views of economy and efficiency' for those of Congress." *Id.; see also Tracer Research Corp. v. Nat'l Envtl. Services Co.,* 42 F.3d 1292, 1294 (9th Cir.1994) ("The [FAA] *'requires* piecemeal resolution when necessary to give effect to an arbitration agreement.'") (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 20, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).

Moreover, the court agrees with SCP that the Accounts Receivable Adjustment issue is easily separable from the claims set forth in the party's respective complaints. Benson Pump's claims primarily concern the May 18, 1999 settlement agreement concerning the Base Purchase Price, which explicitly excluded the accounts receivable issue. SCP's counterclaims concern Benson Pump's alleged misrepresentations concerning the fixed assets and Benson Pump's refusal to turn over accounts receivable pursuant to the Closing Date Agreement that were deposited into Benson Pump's account on SCP's behalf. Thus, neither party's claims will be directly affected by the independent

---

5. SCP also stated during oral argument that it was willing to arbitrate all the issues concern-ing the accounts receivable if Benson Pump so desires.

auditor's resolution of the Accounts Receivable Adjustment issue. The court therefore finds that the Accounts Receivable Adjustment issue should be sent to an independent auditor for resolution as set forth in Sections 1.4(c)-(e) and 1.5 of the Agreement.

E. *Scope of the Stay*

Having determined that the Accounts Receivable Adjustment issue should be sent to arbitration, the court must now determine whether to stay the nonarbitrable claims, pending the outcome of the arbitration proceedings. Once the court has determined, that a dispute falls within the scope of an arbitration agreement, the proceedings in the case as to the arbitrable issue must be stayed pending the completion of arbitration. *See* 9 U.S.C. § 3.[6] However, decision to stay the remaining nonarbitrable claims, is soundly vested in the court's discretionary authority to control it's docket. *See Moses H. Cone*, 460 U.S. at 21, n. 23, 103 S.Ct. 927. Courts generally proceed with the nonarbitrable claims when feasible. *See, e.g., Byrd*, 470 U.S. at 225, 105 S.Ct. 1238 (J. White concurring) (stating that "the heavy presumption should be that the arbitration and the lawsuit will each proceed in its normal course"). Expanding the stay to encompass the nonarbitrable claims in the case is appropriate where the arbitrable claims predominate, or where the outcome of the nonarbitrable claims will depend upon the arbitrator's decision. *See Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 856 (2d Cir.1987). As discussed above, neither party's claims will be directly affected by the independent auditor's resolution of the Accounts Receivable Adjustment issue. Accordingly, the court declines to stay any other claims in this case,

namely Benson Pump's claims against SCP and SCP's counter-claims.

## CONCLUSION

**IT IS HEREBY ORDERED** that SCP's Motion to Compel Arbitration (Doc. # 11) is ***GRANTED***. The parties shall submit the Accounts Receivable Adjustment matter to an independent auditor as set forth in Sections 1.4(c)-(e) of the Asset Purchase Agreement. All nonarbitrable issues, including Benson Pump's claims and SCP's counter-claims, shall proceed in the ordinary course of litigation.

**IT IS FURTHER ORDERED** that a telephonic status conference is scheduled for Wednesday, September 8, 2004, at 9:00 a.m. for the parties to advise the court on the progress of the arbitration proceedings. The parties shall, at least two days prior to said hearing, advise the Deputy Clerk of this court (Rosemary Damron, (775) 686–5835) of the telephone number at which they may be reached for the telephonic hearing.

---

**6.** Section 3 of the FAA provides in relevant part that the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."