**Dan PARISI, Plaintiff,**

v.

**NETLEARNING, INC., Defendant.**

**No. CIV. A. 00–1823–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

May 10, 2001.

Ari Goldberger, Cherry Hill, NJ, Laura Hamilton Calaluca, Dickstein Shapiro Morin & Oshinsky LLP, Washington, DC, for Plaintiff.

Mary Catherine Zinser, Troutman Sanders Mays & Valentine LLP, McLean, VA, for Defendant.

BRINKEMA, District Judge.

*MEMORANDUM OPINION*

Before the Court is defendant Netlearning, Inc.'s Motion to Dismiss, in which defendant argues that plaintiff Dan Parisi's declaratory judgment action constitutes an improper motion to vacate an arbitration award. This motion raises the question of whether the "mandatory administrative proceedings" conducted under the Uniform Domain–Name Dispute Resolution Policy ("UDRP")[1] of the Internet

---

1. *See* ICANN, *Uniform Domain–Name Dispute–Resolution Policy* (August 26, 1999)

Corporation for Assigned Names and Numbers ("ICANN") constitute an arbitration subject to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*[2] Because we find that the FAA's restrictions on judicial review of arbitration awards do not apply to civil actions challenging UDRP panel decisions, the defendant's motion will be DENIED.

## BACKGROUND

This action arises from a dispute concerning Parisi's registration and use of the Internet domain name "netlearning.com."[3] Such disputes have spread with the Internet's emergence as a primary channel for worldwide commercial, recreational, and educational communications. In response to widespread dissatisfaction with extant mechanisms for resolving disputes between domain name registrants and holders of trademark and other intellectual property rights, ICANN adopted the UDRP in 1999.[4]

---

<http://www.icann.org/udrp/udrp-policy-24oct99.htm> ("UDRP"); ICANN, *Rules for Uniform Domain Name Dispute Resolution Policy* (October 24, 1999) <http://www.icann.org/udrp/udrp-rules-24oct99.-htm> ("UDRP Rules").

**2.** ICANN, a non-profit California corporation, governs the assignment of Internet domain names, the allocation of Internet Protocol (IP) address space, and management of the Domain Name System (DNS) and Internet "root" server under the auspices of the Department of Commerce. *See* ICANN, *About ICANN* (last modified March 23, 2001) <http://www.icann.org/general/abouticann.htm>.

**3.** Previous decisions have amply discussed the technical and commercial importance of "domain names" as well as the allocation of responsibilities for their administration and registration between ICANN and various "top-level" domain registrars. *See e.g., America Online v. Huang*, 106 F.Supp.2d 848, 848–53 (E.D.Va.2000) (Ellis, J.); *Register.com, Inc. v. Verio, Inc.*, 126 F.Supp.2d 238, 240–43 (S.D.N.Y.2000).

Briefly, each "host" computer or network connected to the Internet is principally identified by an Internet Protocol ("IP") address consisting of four sets of digits separated by periods. Under the Domain Name System (DNS), each host is also identified by a corresponding alphanumeric domain name, such as "vaed.uscourts.gov." A domain name indicates a specific host's relative position within the hierarchical structure of the DNS. The Internet is anchored to a nameless "root" file. Sprouting from the root file are numerous "Top Level Domains" (TLDs), which are denoted by the alphanumeric segment at the extreme right within any domain name. TLDs include both "generic" TLDs, such as the familiar ".com" and ".net," and country-code TLDs such as the United Kingdom's ".uk". Each TLD encompasses numerous Second Level Domains (SLDs), denoted by the alphanumeric segment to the immediate left of the TLD segment. Each SLD may be divided into subdomains, which may in turn be further divided into subdomains. Thus, the domain name "lawclerks.ao.uscourts.gov" indicates the "lawclerks" subdomain of the "ao" subdomain of the "uscourts" SLD of the ".gov" TLD. *See America Online*, 106 F.Supp.2d at 852 n. 7.

ICANN accredits institutions and corporations to serve as domain name "registrars." Registrars assign specific SLDs within a TLD to "registrants," ensure that each registered SLD is unique within the TLD, and maintain and distribute information correlating SLDs with the appropriate IP addresses. Network Solutions, Inc. is a principal registrar of the second-level domain names within the popular ".com" TLD. *See Thomas v. Network Solutions, Inc.*, 176 F.3d 500, 505 (D.C.Cir.1999).

**4.** The Department of Commerce solicited recommendations and support for the new dispute resolution policy from the World Intellectual Property Organization (WIPO). *See* Management of Internet Names and Addresses, 63 Fed.Reg. 31,741, 31,747 (Department of Commerce, June 10, 1998). WIPO generated a report outlining proposals for the new policy. *See generally* World Intellectual Property Organization, *Final Report of the WIPO Internet Domain Name Process* (Apr. 30, 1999) <http://wipo2.wipo.int/process1/report/finalreport.html> ("WIPO Final Report"). ICANN refined these recommendations into the final UDRP. *See* ICANN, *Frequently Asked Questions* (Sept. 13, 1999) <http://www.icann.org/general/faq1.htm#udrp>.

*1. The UDRP*

Although ICANN exerts quasi-governmental sway over the growth and administration of the Internet, the UDRP is enforced through contract rather than regulation. Every domain name registrar accredited by ICANN must incorporate the UDRP into each individual domain name registration agreement. *See* UDRP, ¶ 1. In effect, the UDRP binds registrants by virtue of their contracts with registrars, such as Network Solutions, Inc., "to submit" to "mandatory administrative proceedings" initiated by third-party "complainants." UDRP, ¶ 4. The scope of such UDRP proceedings is limited to claims of "abusive" registrations of Internet domain names.[5] The UDRP covers no other disputes. UDRP, ¶ 5. Complainants in UDRP proceedings must prove that the disputed "domain name is identical or confusingly similar to a trademark or service mark in which the complainant has rights," that the registrant has "no rights or legitimate interests in respect of the domain name," and that the domain name "has been registered and is being used in bad faith." UDRP, ¶ 4(a). The UDRP identifies badges of "bad faith" and grounds for demonstrating a registrant's "rights and legitimate interests" in a domain name. UDRP, ¶ 4(b)-(c).

Complainants initiate UDRP proceedings directly with a dispute resolution service "provider" designated by ICANN. *See* UDRP Rules, ¶ 3. The UDRP and the UDRP Rules prescribe detailed procedures for appointing either a solo arbitrator or a three-member panel to conduct the inquiry. The UDRP is fashioned as an "online" procedure administered via the Internet. Although a panel may opt in exceptional cases to hold live or telephonic hearings, it is expected to base its decision on "the statements and documents submitted" in accordance with the UDRP, the UDRP Rules, and any "rules and principles of law that it deems applicable." UDRP Rules, ¶¶ 13, 15(a). In the absence of "exceptional circumstances," a panel is expected to issue its decision within fourteen days of its appointment. UDRP Rules, ¶ 15(b).

If the panel rules in the complainant's favor, the only available remedy is for the registrar to cancel the domain name registration or transfer it to the complainant. UDRP, ¶ 4(i). A registrar may automatically implement a UDRP panel decision after ten days unless the aggrieved registrant notifies the registrar within this ten day period that it has "commenced a lawsuit against the complainant in a jurisdiction to which the complainant has submitted" as required by the UDRP Rules. *See* UDRP, ¶ 4(k); UDRP Rules, ¶ 5(e). Upon such notification, the registrar "will take no further action" until it receives "satis-

---

5. *See* ICANN, *Second Staff Report on Implementation Documents for the Uniform Dispute Resolution Policy* (Oct. 25, 1999) <http://www.icann.org/ udrp/udrp–second–staff–report–24oct99.htm> ("ICANN Second Staff Report").

[The UDRP] calls for administrative resolution for only a small, special class of disputes. Except in cases involving "abusive registrations" made with bad-faith intent to profit commercially from others' trademarks (e.g., cybersquatting and cyberpiracy), the adopted policy leaves the resolution of disputes to the courts (or arbitrators where agreed by the parties) and calls for registrars not to disturb a registration until those courts decide. The adopted policy establishes a streamlined, inexpensive administrative dispute-resolution procedure intended only for the relatively narrow class of cases of "abusive registrations.... The policy relegates all "legitimate" disputes—such as those where both disputants had longstanding trademark rights in the name when it was registered as a domain name—to the courts."

*Id.* at ¶ 4.1(c).

factory" evidence of the resolution of the dispute, the dismissal or withdrawal of the lawsuit, or a court order that the registrant does "not have the right to continue using" the domain name. UDRP, ¶ 4(k).

To date, 3,622 separate proceedings concerning 6,410 separate domain names have been initiated under the UDRP. *See* ICANN, *Summary of Status of Proceedings,* (last modified May 7, 2001) <http://www.icann.org/udrp/proceedings-stat.htm>. One of these administrative proceedings concerned the "netlearning.com" dispute now before us.

### 2. The "netlearning.com" Dispute

According to the complaint, Parisi filed a trademark application for the "NETLEARNING" mark on April 1, 1996. (Compl. at ¶ 23). On April 5, 1996, he registered the second-level domain name "netlearning.com" with Network Solutions, Inc. The Patent and Trademark Office (USPTO) subsequently denied the trademark application on grounds of descriptiveness and likelihood of confusion with the existing "LEARN NET" mark (not held by any party to this action). Parisi abandoned the application as of October 15, 1997. (Compl. at ¶ 23). Parisi alleges that he nevertheless continued to use the domain name to operate a website with "links" to university websites, and he claims to be developing "netlearning.com" as a component of his "Megasearch.com" search engine. (Compl. at ¶¶ 25–26).

Meanwhile, Netlearning, Inc. began using the mark "NET LEARNING THE ULTIMATE LEARNING SYSTEM" on June 1, 1997. (Compl. at ¶ 30). Netlearn-

ing registered and began operating its "Net–Learning.com" website on May 12, 1997, and filed a trademark application for "NET LEARNING THE ULTIMATE LEARNING SYSTEM" on April 3, 2000. (Compl. at ¶ 31). Parisi alleges that Netlearning offered to purchase his "netlearning.com" domain name for as much as $22,500 in early 2000, but he refused to transfer the registration. (Compl. at ¶ 36). Netlearning subsequently initiated UDRP administrative proceedings challenging Parisi's registration and use of the "netlearning.com" domain name. (Compl. at ¶ 37).

On October 16, 2000, a three-member UDRP administrative panel issued a split decision in Netlearning's favor, with one panelist dissenting. *See Netlearning, Inc. v. Dan Parisi,* FA 95471 (Nat.Arb.Forum, October 16, 2000). The panel directed Network Solutions to transfer the registration for "netlearning.com" to the defendant.

On October 30, 2000, Parisi filed this declaratory judgment action seeking a declaration of lawful use under the Anti–Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1114(2)(D), and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, as well as a declaration of non-infringement under the Lanham Act, 15 U.S.C. § 1125(a).[6] Parisi also seeks an order directing the USPTO to refuse defendant's pending trademark application for the "NETLEARNING THE ULTIMATE LEARNING SYSTEM" mark, an award of fees and costs, and further relief as the Court deems "just and proper."[7] (Compl. at ¶ 81).

---

**6.** On November 20, 2000, Parisi tendered the registration for the domain name "netlearning.com" for deposit in the registry of this court. For reasons not explained in this record, Parisi's Complaint was not served upon the defendant until February 5, 2001. Netlearning filed the instant motion to dismiss on February 26, 2001.

**7.** The Court recognizes that Parisi, though now represented by counsel, initially filed this action *pro se.* Whether specific counts of his complaint should be dismissed for reasons other than violations of the FAA is not before us.

## DISCUSSION

Netlearning moves for dismissal on the sole ground that the complaint constitutes an improper motion to vacate an arbitration award. Specifically, defendant alleges that Parisi fails to assert any grounds cognizable under the FAA for setting aside an arbitration award and that, in any event, Parisi's action is time-barred under the FAA because it was not served on the defendant within three months of the panel's ruling.

The FAA evinces the "liberal federal policy favoring arbitration," *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Congress enacted the FAA in 1925 to counteract the "hostility of American courts to the enforcement of arbitration agreements." *Circuit City Stores, Inc. v. Adams*, —— U.S. ——, 121 S.Ct. 1302, 1307, 149 L.Ed.2d 234 (2001). The FAA "compels judicial enforcement of a wide range of written arbitration agreements." *Id.*

Federal courts apply the FAA, first and foremost, to effectuate contracting parties' expectations for resolving disputes. This is fundamentally a matter of contract interpretation. "Arbitration is a creature of contract, a device of the parties rather than the judicial process." *AMF Inc. v. Brunswick Corp.*, 621 F.Supp. 456, 460 (E.D.N.Y.1985)(Weinstein, J.); *see*

also *United States v. Bankers Insurance Co.*, 245 F.3d 315, 2001 WL 293669, at *2 (4th Cir.2001)("[A]scertaining the scope of an arbitration agreement is primarily a task of contract interpretation...."). Because the FAA does not define "arbitration," courts have liberally construed that term to encompass various diverse dispute-settlement mechanisms. "If the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration." *See AMF Inc.*, 621 F.Supp. at 460. An arbitration agreement may, by its own terms, be amenable to enforcement through some provisions of the FAA, but not others. The Fourth Circuit recently distinguished "mandatory arbitration, as a prerequisite to initiation of litigation" from "binding arbitration, where the parties must accept an award or decision of the arbitrator." *Bankers Insurance Co.*, 245 F.3d 315, 2001 WL 293669, at *4. Commitments to participate in such "mandatory" proceedings are regularly enforced by compelling arbitration,[8] or staying litigation pending arbitration.[9] *See Harrison v. Nissan Motor Corp.*, 111 F.3d 343, 350 (3d Cir.1997) ("[I]f one party seeks an order compelling arbitration and it is granted, the parties must then arbitrate their dispute to an arbitrators' [sic] decision, and cannot seek recourse to the courts before that time."); *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1208 (9th Cir.1998) (relying on *Brunswick Corp.* and

8. Section 4 of the FAA provides, in relevant part:
   A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition [an appropriate U.S. District Court] for an order directing that such arbitration proceed in the manner provided for in such agreement.
   9 U.S.C. § 4.

9. Section 3 of the FAA provides:
   If any suit or proceeding be brought in any of the courts of the United States upon any

issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.
   9 U.S.C. § 3.

*Harrison* to conclude that an agreement which did not permit recourse to the courts before the decision of a third party constituted arbitration).[10]

Binding arbitration awards may be confirmed through entry of judgment pursuant to the arbitration agreement. *See* 9 U.S.C. § 9.[11] Binding awards may, however, be vacated in narrow circumstances of arbitrator misconduct, serious procedural flaws, or "manifest disregard of the law." *See* 9 U.S.C. §§ 10[12]–11[13]; *Upshur Coals Corp. v. United Mine Workers of America, District 31,* 933 F.2d 225, 229 (4th Cir.1991)(arbitration award may be vacated when arbitrators "understand and correctly state the law, but proceed to

disregard the same"). A motion to vacate an arbitration award under § 10 constitutes the "sole method to challenge" a binding award. *ANR Coal Co., Inc. v. Cogentrix of North Carolina, Inc.,* 173 F.3d 493, 497 (4th Cir.1999). A party seeking to vacate such an award must file a § 10 motion and serve notice of the motion "upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. A motion to vacate served more than three months after the award is time-barred. *See Sverdrup Corp. v. WHC Constructors, Inc.,* 989 F.2d 148, 151 (4th Cir. 1993). Aggrieved parties may not circumvent the FAA by packaging a motion to vacate as a fresh complaint. *See ANR*

---

**10.** Some courts, relying in part on their inherent equitable powers, have stayed litigation and compelled participation in non-binding procedures as long as there are "reasonable commercial expectations" that the procedures would "settle" disputed issues. *AMF Inc.,* 621 F.Supp. at 460–61; *see also CB Richard Ellis, Inc. v. American Env'tal Waste Mgmt.,* No. 98–CV–4183 (JG), 1998 WL 903495, at *2 (E.D.N.Y.1998) (compelling mediation under the FAA where mediation clause "manifests the parties intent to provide an alternative method to 'settle' controversies arising under the ... agreement"); *Bankers Insurance Co.,* 245 F.3d 315, 322 (following *AMF Inc.* to stay litigation and compel arbitration).

**11.** Section 9 of the FAA provides, in relevant part, that:

If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.

9 U.S.C. § 9.

**12.** Under 9 U.S.C. § 10(a), a court may vacate an award:

(1) Where the award was procured by corruption, fraud, or undue means.
(2) Where there was evident partiality or corruption in the arbitrators, or either of them.
(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

**13.** Pursuant to 9 U.S.C. § 11, a court may modify an award:

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

9 U.S.C. § 11.

*Coal Co., Inc.,* 173 F.3d at 497 (although plaintiff "clearly erred by labeling its pleading a civil complaint, rather than a motion to vacate," the action was permitted to proceed under the FAA because no prejudice resulted).

■ Netlearning argues that the UDRP "administrative proceedings" should be deemed an "arbitration" as envisioned by the FAA and that Parisi's declaratory judgment complaint should be treated as a motion to vacate an arbitration panel's award which must comport with the requirements of § 10 and § 12 of the FAA. Netlearning argues that because it was served with Parisi's complaint over three months after the UDRP panel issued its decision, any motion to vacate is time-barred under 9 U.S.C. § 12. Netlearning further argues that the complaint articulates no cognizable ground for vacating an arbitration award under the FAA. Parisi counters that the FAA does not apply to the UDRP and that his complaint raises issues far beyond the scope of the UDRP panel ruling.

We begin our analysis of the FAA's applicability by examining the specific arbitration agreement at issue, that is, the UDRP.[14] Clearly, the UDRP creates a contract-based scheme for addressing disputes between domain name registrants and third parties challenging the registration and use of their domain names. However, in our view, the UDRP's unique contractual arrangement renders the FAA's provisions for judicial review of arbitration awards inapplicable.

First, there is no reason to "stay" litigation under § 3 because, quite simply, the UDRP contemplates parallel litigation. Nothing in the UDRP restrains either party from filing suit before, after, or during the administrative proceedings. *See*

UDRP, ¶ 4(k). If litigation commences during the course of a proceeding, the panel has "the discretion to decide whether to suspend or terminate the administrative proceeding, or to proceed to a decision." UDRP Rules, ¶ 8(a); *see also* Jason Osborn, Note, *Effective and Complementary Solutions to Domain Name Disputes: ICANN's Uniform Domain Name Dispute Resolution Policy and the Federal Anticybersquatting Consumer Protection Act of 1999,* 76 Notre Dame L.Rev. 209, 241 (2000) (explaining that trademark holders may simultaneously "retrieve" an infringing or dilutive domain name through the UDRP panel process and seek damages and final adjudication of trademark rights through litigation).

Second, it would not be appropriate to "compel" participation in UDRP proceedings under § 4 as a prerequisite to litigation because UDRP complainants, as strangers to the registration agreement, are under no obligation to avail themselves of the UDRP. *See BroadBridge Media, L.L.C. v. Hypercd.com,* 106 F.Supp.2d 505, 509 (S.D.N.Y.2000)(trademark holder not required to pursue UDRP proceedings before filing complaint challenging use of domain name). Only the registrant is obligated to participate in a UDRP proceeding if a complaint is filed. If a registrant declines to participate in the panel process, the panel may simply "decide the dispute based on the complaint." UDRP Rules, ¶ 5(e). Although the UDRP describes the process as "mandatory" in the sense that a registrant's refusal to participate may lead to an uncontested loss of the domain name, the process is not "mandatory" in the sense that either disputant's legal claims accrue only after a panel's decision. *See Bankers Insurance Co.,* 245 F.3d 315, 2001 WL 293669, at *4.

---

14. Although the record does not include the full text of Parisi's domain name registration agreement, it is undisputed that the UDRP binds Parisi.

Third, because the remedies available through the UDRP are so narrow and specific, we find no basis for confirming and enforcing a UDRP panel decision through § 9. Moreover, the FAA only permits entry of judgment "if the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration." 9 U.S.C. § 9. The UDRP nowhere suggests such agreement. It not only countenances parallel litigation; it mandates a judicial forum for challenges to UDRP decisions. To initiate UDRP proceedings, a complainant must first agree to litigate any challenges to the panel's ruling in either the jurisdiction encompassing the registrar's principal place of business or the jurisdiction encompassing the registrant's record address. *See* UDRP Rules ¶ 3(xiii). An aggrieved registrant can effectively suspend the panel's decision by filing a lawsuit in the specified jurisdiction and notifying the registrar in accordance with ¶ 4(k) of the UDRP.[15] From these provisions, it is clear that ICANN intended to provide "parity of appeal," ensuring a "clear mechanism" for "seeking judicial review of a decision of an administrative panel canceling or transferring the domain name." ICANN, *Staff Report on Implementation Documents for the Uniform Dispute Resolution Policy* (September 29, 1999) <http://www.icann.org/udrp/staff-report-29sept99.htm>.

Finally, we specifically hold that judicial review of UDRP decisions is not confined to a motion to vacate an arbitration award under § 10 of the FAA. To begin with, the FAA's structure [16] and basic tenets of contract interpretation limit the extreme deference of §§ 10 and 12 to proceedings intended by the contracting parties to be binding. The UDRP's contemplation of parallel litigation and abbreviated proceedings does not invite such deference.

More importantly, the UDRP itself calls for comprehensive, *de novo* adjudication of the disputants' rights. Registrars will move forward with a panel's decision only after a competent court or arbitration panel determines that the original registrant does "not have the right to continue to use" the disputed domain name. This implies more than a review of the procedural soundness of the UDRP decision under § 10 of the FAA; it implies resolution of the parties' overarching trademark, contract, and other claims and defenses. WIPO's Final Report specifically recommended that

> the availability of the administrative procedure should not preclude resort to court litigation by a party. In particular, a party should be free to initiate litigation by filing a claim in a competent national court instead of initiating the administrative procedure, if this is the preferred course of action, and should be able to seek a *de novo* review of a dispute that has been the subject of the administrative procedure.

WIPO Final Report, ¶ 150(iv). *Cf. Weber–Stephen Products Co. v. Armitage Hardware and Building Supply, Inc.*, No. 00–C–1738, 2000 WL 562470, at *2 (N.D.Ill. May 3, 2000) (district court "not bound by the outcome of the ICANN administrative proceeding").

---

**15.** However, the UDRP only requires the registrar to suspend implementation of the panel decision when the registrant files a lawsuit in the same jurisdiction to which the complainant consented when initiating the UDRP process. If the registrant were to bring a lawsuit against the complainant in any other jurisdiction, the UDRP would not, as a matter of contract, restrain the registrar from transferring or cancelling the domain name.

**16.** The FAA first mentions a motion to vacate an award as an exception to a court's duty to enforce the award through § 9. *See* 9 U.S.C. § 9.

Based on this analysis, we conclude that the Federal Arbitration Act's limitations on judicial review of arbitration awards do not apply to civil actions seeking review of UDRP panel decisions concerning domain names.

### CONCLUSION

For these reasons, the defendant's Motion to Dismiss will be DENIED by an appropriate order.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, Netlearning, Inc.'s Motion to Dismiss is DENIED.

The Clerk is directed to forward copies of this Order to counsel of record.